## MASON v. CITIZENS' NAT. TRUST & SAVINGS BANK OF LOS ANGELES.

### In re LOS ANGELES MFG. CO.
### No. 7267.

Circuit Court of Appeals, Ninth Circuit.
May 31, 1934.

Bicksler, Parke & Catlin and W. G. Danielson, all of Los Angeles, Cal., for appellant.

H. W. O'Melveny, Walter K. Tuller, Louis W. Myers, and Clinton La Tourrette, all of Los Angeles, Cal., for appellee.

Atlee Pomerene and Frank Harrison, both of Cleveland, Ohio, and Mortimer A. Kline, of Los Angeles, Cal., amici curiæ.

Clarence M. Hanson, of Los Angeles, Cal., and Joseph V. Kline, of New York City (Freston & Files, of Los Angeles, Cal., and Mudge, Stern, Williams & Tucker, of New York City, of counsel), for Chase Nat. Bank of New York and Bank of America, amici curiæ.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

On December 31, 1926, the Los Angeles Manufacturing Company, engaged primarily in the manufacture of water well and oil well casing, pipes, tanks, and similar equipment, executed and delivered to a predecessor of the appellee herein, as trustee, an indenture dated July 1, 1926, to secure the payment of a bonded indebtedness of $150,000 that had been theretofore created by the corporation.

No question is raised as to the propriety of the bond issue. The indenture was accompanied by the affidavit of each of the parties that the former was made in good faith and without any design to hinder, delay, or defraud creditors, and was duly recorded in the office of the county recorder of Los Angeles county on December 31, 1926, and indexed as a deed, a mortgage, a trust deed, a chattel mortgage, and a power of attorney.

By the terms of the indenture, the present bankrupt "granted, bargained, sold, aliened," etc., to the trustee, certain described real and personal property. No question is raised as to the lien created upon the real property.

The indenture then set forth, with reference to the personal property:

"Parcel Two.

"All other property real or personal, and wheresoever situate * * * including all machinery, tools and equipment, trucks and other vehicles, stock of raw steel on hand or hereafter purchased, together with the merchandise of every kind and nature, and wheresoever situated, which the Company now owns or holds, or may hereafter acquire, whether the same is specifically enumerated herein or not, it being the intent of the Company to include hereunder all property of every kind or description owned by it * * * and which it may hereafter acquire, together with all rights, claims, privileges and immunities, whether now owned or hereafter acquired, together with any and all buildings, improvements, and appurtenances, now standing, or at any time hereafter constructed, or placed upon any lands of the Company, or any part thereof, and all and singular the tenements, hereditaments and appurtenances thereunto belonging * * * and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, now owned or hereafter acquired or constructed for the use of this corporation."

The company agreed that it would not declare dividends except out of surplus earnings remaining after providing for sinking fund payments, operating expenses, and other deductions; that it would not distribute its assets or earnings to preferred stockholders, except by way of dividends; that the trust indenture would always be kept a first lien upon the property described therein, and upon all other property thereafter acquired, and that the company would not voluntarily suffer to be created any lien upon the trust estate of priority to that of the indenture; that, if any paramount title should be established on the property covered by the indenture, the company would proceed to extinguish it; that no reorganization of the company should be allowed to impair the lien of the indenture, etc.; that, until default, the company would retain actual possession of the trust estate, its income, etc.; that it might sell its property, both real and personal, but that it should in that event "renew the same or substitute other property," which renewed or substituted property would be subject to the lien of the indenture; that, in lieu of such renewal or substitution, the company might pay the proceeds derived from the property sold, into its sinking fund; that failure to renew any building, as required by the indenture, would be considered an act of default; that, if an event of default should happen, the trustee might enter into the trust estate, with power of use, management, maintenance, restoration, insurance, etc.

After December 31, 1926, the present bankrupt continued in possession of its place of business and operated upon an extensive basis until the bankruptcy proceedings. Materials were purchased and manufactured into usable products, which, in turn, were sold. Old machines and equipment were discarded and new machinery and equipment were added to the plant. All acts performed by a normal operating business concern for a period of nearly six years after the recordation of the indenture were performed by the present bankrupt.

On November 9, 1932, a creditors' involuntary petition in bankruptcy was filed against the company, and a receiver was appointed to preserve and manage the property. The case was then referred to a referee in bankruptcy, as special master. The receiver took immediate possession of the assets of the bankrupt. The appellee served the receiver with notice that the bankrupt had defaulted under the terms of the indenture, and declared that all rights of the bankrupt to possession of the real and personal property covered by the indenture had ceased. The exist-

ence of an event of default was stipulated in the court below.

The receiver thereupon prayed for an order to show cause against the appellee why all of the property then in the possession of the receiver should not be determined to be free of any right of lien arising from the trust indenture.

By a general order of reference for general administration made in the interim, the case had been referred to the same person as referee in bankruptcy who had theretofore been the special master, so that at the time of hearing all parties stipulated to the jurisdiction of the court to hear the matter. A stipulation of facts, together with specific questions, was presented to the court.

In answer to those questions, the referee in bankruptcy filed an order as to the validity and the extent of the lien of the trust indenture. The only paragraph of that order and decree challenged on this appeal is the following: "4. That the personal property located in Los Angeles County which has been acquired after the delivery and recordation of said trust indenture, December 31, 1926, is not effected [affected] by said trust indenture and the same creates no lien thereon."

A review of certain paragraphs of the referee's order, including the one just quoted, was sought by the appellee. The court below affirmed all parts of the referee's order save paragraph 4, set forth above. As to that paragraph, the District Judge, in the closing portion of a "Memorandum of Ruling on Reviews of Referee's Order," held: "In conclusion, I am of the opinion that the lien of the Chattel Mortgage arose and was imposed upon the personal property described and included in the Trust Instrument when such personal property was acquired by the Los Angeles Manufacturing Company."

From the foregoing holding of the court below, the present appeal is being prosecuted.

At the outset, we may state that the entire question of the operation of chattel mortgages on after-acquired property was fully discussed by this court in the case of Howell v. War Finance Corporation, 71 F.(2d) 237, decided May 31, 1934. The authorities referred to hereinbelow are in addition to the many quoted and cited in that opinion.

█ It is well settled that, "while chattel mortgages are instruments of general use, each state has a right to determine for itself under what circumstances they may be executed, the extent of the rights conferred thereby, and the conditions of their validity." Etheridge v. Sperry, 139 U. S. 266, 276–277, 11 S. Ct. 565, 569, 35 L. Ed. 171; Security Warehousing Co. v. Hand, 206 U. S. 415, 425, 27 S. Ct. 720, 51 L. Ed. 1117, 11 Ann. Cas. 789.

█ Nor does the fact of bankruptcy, save in so far as is specifically provided for in the Bankruptcy Act (11 USCA), affect the validity of liens authorized by state law.

In the case of In re Brannon (C. C. A. 5) 62 F.(2d) 959, 961, certiorari denied, Ryan v. City of Dallas, 289 U. S. 742, 53 S. Ct. 692, 77 L. Ed. 1489, the court said: "The view generally taken is that true liens, however arising, which are not expressly invalidated by the Bankruptcy Act, remain good, and the trustee takes his title under section 70 (11 USCA § 110) subject to them." See, also, Britton v. Western Iowa Co. (two cases) (C. C. A. 8) 9 F.(2d) 488, 490, 45 A. L. R. 711, and cases there cited.

Under section 47a of the Bankruptcy Act (11 USCA § 75 (a), " * * * such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

Regarding the effect of this provision, which was incorporated into the Bankruptcy Act by an amendment passed in 1910, this court, in the case of In re Lane Lumber Co., 217 F. 550, 552, 553, said:

"The amendment was obviously designed to cure what was deemed a defect in this regard, and to confer the power upon the trustee, in the interest of the general creditors, to contest the sufficiency of any claimed lien, pledge, or security that 'a lien creditor or a judgment creditor might challenge had bankruptcy not intervened.' Loveland on Bankruptcy (4th Ed.) § 372. There is nothing in the amendment indicating that its purpose was to prescribe a rule by which the validity or priority of such liens is to be determined or enforced. In that respect the law is left untouched, and the validity and rank of the lien is now to be ascertained by the same applicable principles as obtained prior to the change; and 'a lien which is valid under the state law as against the claims of such creditors; is valid under the bankrupt law as

against a trustee since the amendment as well as before it.' Id. The amendment, in other words, was designed only to clothe the trustee with the right to question the validity of any lien claimed against the property of the estate which may be defective under the law creating it, notwithstanding the bankrupt might have been estopped to do so. Pacific State Bank v. Coats, 205 F. 618, 123 C. C. A. 634, Ann. Cas. 1913E, 846. It goes no further. It does not affect the character of the trustee's title as such. That is defined in section 70 of the act, which clothes the trustee only 'with the title of the bankrupt as of the date he was adjudged a bankrupt.'

"The question, therefore, is, Was the lien of the claimant for any reason defective under the law of the state as against 'a creditor holding a lien by legal or equitable proceedings thereon'? If it was, then the trustee may question it; otherwise not."

See, also, Eggleston v. Birmingham Purchasing Co. (C. C. A. 5) 15 F.(2d) 529, 530.

In the instant case, the receiver in bankruptcy alleged that he was in possession of the property upon which a lien was claimed by the appellee, by virtue of the trust indenture. Accordingly, the property is to be considered as "in the custody of the bankruptcy court," and the trustee is to "be deemed vested with all the rights * * * of a creditor holding a lien by legal or equitable proceedings thereon."

Indeed, both the appellant and the amici curiæ who have filed a brief in his behalf agree that, in California at least, "as between the parties there seems to be no question * * * that the after-acquired clause in a chattel mortgage creates a lien upon such after-acquired property." It is likewise conceded that there is no California case which squarely settles the point here in controversy.

Accordingly, we will confine our discussion solely to the question as to what lien, if any, the indenture created, as against other lien creditors of the bankrupt, upon personal property acquired by the bankrupt in Los Angeles county after the date on which the indenture was recorded. As we have already indicated, the answer to that question must be found primarily in the statutes and in the jurisprudence of California.

The applicable sections of the Civil Code of California are the following:

"§ 2883. Lien on future interest. An agreement may be made to create a lien upon property not yet acquired by the party agreeing to give the lien, or not yet in existence. In such case the lien agreed for attaches from the time when the party agreeing to give it acquires an interest in the thing, to the extent of such interest."

"§ 2930. Subsequently acquired title inures to mortgagee. Title acquired by the mortgagor subsequent to the execution of the mortgage, inures to the mortgagee as security for the debt in like manner as if acquired before the execution."

It should be observed that section 2883 is part of an article entitled "Creation of Liens," and that, in turn, the article so entitled is part of a chapter captioned "Liens in General." Section 2877 provides that "contracts of mortgage" are subject to the provisions of the chapter on "Liens in General." Similarly, section 2930 is part of an article entitled "Mortgages in General." There are other articles in the same chapter dealing with "Mortgages of Real Property" and "Mortgages of Personal Property."

It may therefore be inferred that both the sections above quoted are general in their nature, and refer both to real and *personal* property.

Continuing our research into the California statutes, we find the following section in the Civil Code, dealing specifically with chattel mortgages:

"§ 2957. When void as to third persons. A mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and encumbrancers of the property in good faith and for value, unless:

"1. It is accompanied by the affidavit of all the parties thereto that it is made in good faith and without any design to hinder, delay, or defraud creditors;

"2. It is acknowledged or proved, certified, and recorded in like manner as grants of real property."

It would seem clear that chattel mortgages which do conform to the requirements of section 2957 are *not* void as to third persons.

Since it is conceded that a chattel mortgage on after-acquired property is valid in California as between the original parties thereto, we will not refer to the many early cases that establish this principle. Even in some of these early California decisions, however, there may be found language which would justify the belief that, if the issue had been squarely presented to the court, it would have upheld such a chattel mortgage

even as to third persons. Furthermore, it is observable that neither section 2883 nor section 2930 contains any exceptions whatsoever in favor of subsequent creditors, purchasers, or incumbrancers.

In Bibend v. L. & L. F. & L. Ins. Co., 30 Cal. 78, 86, Mr. Chief Justice Currey said: "Courts of equity are in the habit of giving effect to assignments of trusts and possibilities of trusts; and contingent interests and expectances, whether they are in real estate or in personal property, as well as to assignments of choses in action. Contingent rights and interests are not ordinarily assignable at law, but they are in equity. Assignments of such rights and interests, in being, are upheld and enforced by Courts of equity. And more than this, these Courts support and give effect to assignments of 'things which have no present actual or *potential* existence, but rest in mere possibility; not indeed as a present positive transfer, operative in praesenti, for that can only be done of a thing in esse, but as a present contract, to take effect and attach as soon as the thing comes in esse.' 2 Story's Eq., § 1,040; Mitchell v. Winslow, 2 Story, 638, 644 [Fed. Cas. No. 9673]. In Mitchell v. Winslow, Mr. Justice Story cites many authorities supporting this doctrine, and refers particularly to the opinion of Vice Chancellor Wigram, in Langton v. Horton, 1 Hare 549, as exceedingly cogent in its reasoning and satisfactory in its conclusions; and he then says: 'It seems to me a clear result of all the authorities that wherever the parties, by their contract, intend to create a positive lien or charge, either upon real or personal property, whether then owned by the assignor or contractor, or not, or if personal property, *whether it is then in esse or not,* it attaches in equity as a lien or charge upon the particular property, as soon as the assignor or contractor acquires a title thereto, against the latter, and all persons asserting a claim thereto, under him, either voluntarily, *or with notice,* or in bankruptcy." (Italics our own.)

It is to be noticed that the Bibend Case, supra, was decided in 1866, while the three Code provisions, supra, which are here chiefly controlling, were enacted in 1872 and 1874.

Recent California cases have more clearly defined the legal effect, as against third persons, of chattel mortgages on after-acquired property.

The importance of the intention of the original parties, clearly expressed, and the bearing that prior recordation has upon the rights of third persons, were emphasized in Schelling v. Thomas, 96 Cal. App. 682, 274 P. 755, 757: "The instrument in question clearly indicates the intention of the parties to make the property mentioned therein security for a debt, and the property is described with sufficient particularity. The execution of the instrument was in good faith, for a valuable consideration, as shown upon the face of the writing, and the money secured thereby went into a portion of the property thereby incumbered. It was executed prior to the execution of the Conley trust deed, *and was recorded prior to the recordation of said trust deed.* Contrary to the last of appellant's contentions in attacking the validity of the instrument, the fact that the record title to the McKee's mill lot was not in Thomas at the time the instrument was executed is immaterial, in the light of section 2930, Civil Code, which provides that: [Section quoted.]" (Italics our own.)

The court quoted with approval from 19 Cal. Jur. 734, 735, as follows: "An equitable lien upon real property is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or encumbrancers with notice, actual or constructive. Upon recording an instrument creating an equitable mortgage or lien, the lien becomes a matter of record, and notice is thus given to all the world that the title is encumbered, so that any one subsequently dealing with the property would deal with it subject to the lien."

The amici curiæ who have filed briefs on behalf of the appellant cite three California cases in which, it is claimed, the Supreme Court of the state "discussed the necessity of 'potential existence' in order for chattel mortgage to take precedence over an attachment, and, as we shall show elsewhere, the appointment of a Trustee in Bankruptcy or a Receiver at the instance of general creditors has all the effects of an attachment."

In the first place, the amici curiæ assume that the after-acquired property in the instant case had no potential existence at the time the trust indenture was executed. The record is barren of any ground for such an assumption. The "Stipulation Regarding Trust Indenture" sets forth "that said alleged bankrupt owned at the time of the execution and delivery of said trust indenture and/or subsequently acquired, certain machinery, tools, equipment, vehicles, raw materials, and other items of personal property," etc. In his petition for an order to show

cause against the appellee, the receiver described the property in his possession in similar language, and alleged that the appellee claimed some right to it by virtue of the trust indenture.

If any of this subsequently-acquired property had no potential existence, it was the duty of the appellant to have the record so show. It is fundamental law that the primary responsibility for the preparation of a proper transcript rests upon the appellant, and that, in the absence of an affirmative showing to the contrary, the appellate court will assume that the court below had before it facts which warranted its judgment or decree.

Secondly, none of the three cases cited by the amici curiæ involves an interpretation of either section 2883 or section 2930.

In Arques v. Wasson, 51 Cal. 620, 623, 21 Am. Rep. 718, the action was one of replevin to recover from a sheriff certain grain and flaxseed seized and sold by him under an attachment and execution against one Hansen. The latter had leased from the plaintiffs certain land, and, to secure the payment of the rent and a store account, Hansen executed a mortgage on all crops to be produced during the ensuing season. At the time of the execution of the mortgage, Hansen was in possession of the land, but had not then plowed or seeded it. When the crop matured it was seized under an attachment by another creditor of Hansen. The plaintiff in the replevin action recovered, and the defendant sheriff appealed.

A careful study of the opinion discloses that the Supreme Court affirmed the case under principles of general law, and did not find it necessary to invoke the California statute sustaining chattel mortgages of that kind. The court said: "The general rule undoubtedly is that a person cannot convey a thing not in esse, or in which he has no present interest. But it is quite as well settled, that if the thing has a potential existence it may be mortgaged or hypothecated."

The court then quoted a number of decisions from other jurisdictions, decided the question on general law, and upheld the mortgage.

Similarly, Alferitz v. Perkins, 122 Cal. 391, 55 P. 149, 150, in which lambs born after the execution of the mortgage were attached, did not involve an interpretation of section 2883 or section 2930, but was decided solely upon the ground that "the alleged mortgaged property was so confused and mingled with the unmortgaged property as to render it impossible to identify and segregate the same." The amici curiæ are in error when they state that the question of "potential existence" was discussed in that case.

Finally, the decision of Hall v. Glass, 123 Cal. 500, 56 P. 336, 337, 338, 69 Am. St. Rep. 77, merely cited the case of Arques v. Wasson, supra, with approval, and followed the "potential existence" theory. In the Hall Case the court had before it two contentions: First, that there was "no defined limit to the continuance of the mortgage during which the lien is to continue"; and, second, "that, the proceedings in insolvency having been instituted in 1895, there was then no lien upon the crops of 1896 which were then unplanted, and, the debt being discharged by the insolvency, there was no debt to sustain any lien to arise thereafter when the crop began to have an existence." The court sustained the mortgage as to the crops of both the years 1895 and 1896—even though the mortgagor was discharged from his debts on March 11, 1896—and made no reference whatever to the California statutes invoked in the instant case. The court held that, after the lien "is created, insolvency proceedings cannot affect the debt to the impairment of the lien," and that the mortgage was "good to the extent of the crops planted during the life of the note."

Against the inferences that amici curiæ would draw from the three foregoing decisions, we have the plain positive statement in the Bibend Case, supra, that courts of equity "support and give effect to assignments of 'things which have no present actual or potential existence, but rest in mere possibility,'" etc.

The highest tribunals of other states, some of them having statutes identical to sections 2883 and 2930 of the California Civil Code, supra, have upheld mortgages of after-acquired chattels, even as against subsequent purchasers or judgment creditors.

One of the best-reasoned and most scholarly of such decisions is that by Mr. Chief Justice Tripp, of the Supreme Court of Dakota, in Grand Forks Nat. Bank v. Minneapolis & N. Elevator Co., 6 Dak. 357, 43 N. W. 806, 807, 810. The case is particularly illuminating in view of the contention made on behalf of the appellant herein, that "recordation before the property is acquired cannot be compliance with" section 2959 of the Civil Code of California, which requires that a mortgage of personal property be recorded "in the county in which the property mortgaged is situated."

The Grand Forks Case involved a chattel mortgage of crops to be grown upon the mortgagor's land. The mortgagor subsequently sold the wheat to the defendant elevator company, and the plaintiff bank, which was the mortgagee, sued in conversion.

That the court there had precisely the question that we have to determine in the instant case is disclosed by the following language: "* * * The simple question presented to the court is, was this mortgage upon crops to be grown upon the land of the mortgagor, made and filed prior to the planting thereof, but remaining on file thereafter, valid, as against this defendant, without actual notice to him of the existence of said mortgage?"

Upholding the mortgage even as against third parties, the learned Chief Justice thus answered the question: "It is the fact that the instrument is on file when *hostile rights* seek to attach that gives the filing effect, rather than the fact that such filing was made at some particular date. It is not the indorsement of the date, and signature of the proper officer, upon an instrument, that makes the filing. Such act is mere evidence or memoranda of the fact of filing. The filing is a continuous act. It is the fact of being on file—that is, among the files or records of the office—*that gives it validity as against third parties*. Every such paper is continuously filed every day that it remains in the office of the custodian thereof. The date of filing is but the date of the commencement of the filing. This mortgage was filed, in contemplation of law, every day it remained on file in the office of the register of deeds after the property came into existence;· and it was filed in such office on the day the lien attached to the growing crop." (Italics our own.)

It must be remembered that, at the time the Grand Forks decision was handed down, the Territory of Dakota had statutes verbatim the same as sections 2883 and 2930 of the California Code. Those statutes are quoted in the Grand Forks opinion.

See, also, McKay v. Shotwell, 6 Dak. 124, 50 N. W. 622, another Dakota decision, which involved an attachment; Iverson v. Soo Elevator Co., 22 S. D. 638, 119 N. W. 1006, 1007–1008; National Bank v. Elkins, 37 S. D. 479, 159 N. W. 60, 62; Payne v. McCormick Harvesting Mach. Co., 11 Okl. 318, 66 P. 287, 288, in which the Grand Forks Case, supra, is followed, and a passage therefrom as to "hostile interests" is quoted.

As in the Schelling Case, supra, the importance of recordation and of the parties' intention was stressed by the Supreme Court of Idaho in Dover Lumber Co. v. Case, 31 Idaho, 276, 170 P. 108, 111: "The intention of the parties that the after-acquired property involved in this action should be covered by the mortgage and held as security for the debt is manifest from the language of the instrument. The great weight of authority supports the rule above quoted from Cyc., to the effect that such a mortgage is valid and binding upon the parties thereto and all others having notice of it. Section 3408, Rev. Codes, states the circumstances under which such a mortgage will be held void, and points the way which must be followed in order that it be held valid, as against creditors of the mortgagor and subsequent purchasers and incumbrancers of the property."

The court then quoted the language of section 3408, which is the same, save for immaterial differences in language, as section 2957 of the Civil Code of California, supra.

The Idaho tribunal then continued, in language that is particularly apposite in the instant case: "It is not questioned that this section was complied with in all particulars. While the after-acquired property was not described with particularity as to quantity, quality, character, and kind, the general statements, above quoted, embrace all *personal property* owned by Case, and thereafter to be acquired by him, and used, or to be used, in carrying out the contract. The mortgage described the property to be acquired as well as it could be done, under the circumstances, by stating the place where it would be found and the use to which it would be put, and by particularly describing other like property to be found in the same place and used for the same purpose, *and, when it was filed for record, was notice to appellants, who afterwards acquired mortgages upon the same chattels, and rendered their liens subsequent to that of respondent.*" (Italics our own.)

A lien created by a recorded trust deed in the nature of a mortgage is superior to a subsequent lien created by a judgment, according to the decision of the Supreme Court of Oregon in Clarke–Woodward Drug Co. v. Hot Lake Sanatorium Co., 88 Or. 284, 169 P. 796, 798, 799. That was a creditors' suit brought to impress the lien of the plaintiff's judgment upon certain property of the defendants, and for other purposes. The Hot Lake Sanatorium Company issued $250,000 of interest-bearing bonds, and to "insure" the issue it executed a deed of trust in the

nature of a mortgage on a certain tract, "all of its personal property, and upon all the property that it should thereafter acquire." A number of other tracts were thereafter acquired by the Hot Lake Sanatorium Company, before the debt represented by the judgment was contracted.

The complaint prayed that the lien of the plaintiff's judgment, obtained long after the execution of the trust deed, be established on a sum of money alleged to have been received by a lessee of the Hot Lake Sanatorium Company's successors, the money being derived from unincumbered property theretofore owned by the sanatorium company. It was also asked that the judgment lien be declared superior to all other liens, including that of the bondholders under the deed of trust theretofore issued by the sanatorium company; "that the lien so established be foreclosed, and such of the assets be sold or accounted for and the proceeds applied to the satisfaction of plaintiff's judgment; that in case said judgment cannot be satisfied from said property * * * plaintiff have personal judgment for the amount thereof against each of the defendants." The court said: "It was evidently the intent of the parties to the trust deed that all after-acquired property should be subject to the lien created thereby, and we find nothing in the evidence indicating that the purchase was so far removed from the general objects of the corporation as to render it impossible for it to take and hold it."

After citing a large number of cases relied upon by the plaintiff in that case, the court continued:

"The effect of these cases may well be summed up in the language of Mr. Justice Harlan in Smith v. McCullough, 104 U. S. 25, 27, 26 L. Ed. 637:

" 'That question is within a very narrow compass. It must be solved so as to give effect to the intention of the parties, to be collected as well from the words of the instrument as from the circumstances attending its execution.'

"Jones on Mortgages (3d Ed.) § 153, states the rule as follows:

" 'The chief question therefore is whether the parties to the mortgage intended that the after-acquired property, which is in any case the subject of litigation, should be subject to the lien of the mortgage; and it will be noticed that in the recent cases the contention is generally upon this question.' [Many cases cited by the court.]

"We conclude therefore that all the property mentioned in the complaint became subject to the lien created by the trust deed, and that such lien was superior to any lien *created by plaintiff's judgment.*" (Italics our own.)

So much for the views held in Northwestern jurisdictions.

A Southeastern state Supreme Court has followed the doctrine that we here sustain.

In Hickson Lumber Co. v. Gay Lumber Co., 150 N. C. 282, 63 S. E. 1045, 1048, 21 L. R. A. (N. S.) 843, the Supreme Court of North Carolina used language that is squarely in point here: "In North Carolina a mortgage upon after-acquired property, being enforceable inter partes, becomes, upon registration, valid and enforceable against subsequent purchasers, because the registration is an effectual notice as against the world."

Finally, it is to be noted that federal courts have repeatedly sustained the same doctrine.

In Central Trust Co. v. Kneeland, 138 U. S. 414, 419, 11 S. Ct. 357, 358, 34 L. Ed. 1014, the same railroad company had issued two mortgages to the same trustee. Both mortgages contained after-acquired property clauses. On foreclosure proceedings under the first mortgage, Kneeland became, in the interest of the bondholders, the purchaser. After confirmation of sale and passage of title, and during the pendency of a suit to foreclose the second mortgage, a proceeding was commenced by the trustee in the second mortgage and certain holders of bonds secured thereby, against Kneeland, the purchaser. The bill was practically one to quiet the title of those security holders to certain terminals in Toledo. In answer to this bill, Kneeland set up his title under the first mortgage and the sale, and prayed to have his title quieted to these terminals. The Circuit Court rendered a decree in favor of Kneeland, thereby adjudging priority of lien to the first mortgage.

Among the after-acquired properties enumerated in the first mortgage were a number of chattels, such as engines, cars, supplies, and tools. It is to be observed that the mortgagor railroad company did not figure in the suit, so that the question of estoppel, so frequently referred to in decisions dealing with the rights of the immediate parties to chattel mortgages, was not involved in the Kneeland Case.

In affirming the Circuit Court, Mr. Justice Brewer said: "The first mortgage had

the 'after-acquired property' clause in it. It is settled that such a clause is valid, and that thereby the mortgage covers not only property then owned by the railroad company, but becomes a lien upon all property subsequently acquired by it which comes within the description in the mortgage. Pennock v. Coe, 23 How. 117 [16 L. Ed. 436]; Dunham v. Cincinnati, Peru, etc., Railway, 1 Wall. 254 [17 L. Ed. 584]; Galveston· Railroad v. Cowdrey, 11 Wall. 459 [20 L. Ed. 199]; Thompson v. Valley R. R. Co., 132 U. S. 68, 10 S. Ct. 29 [33 L. Ed. 256]. ·And this is true, not only as to property to which it acquires the legal title, but also as to that to which it acquires only a full equitable title. Toledo, etc., R. R. Co. v. Hamilton, 134 U. S. 296, 10 S. Ct. 546 [33 L. Ed. 905]."

It is argued on behalf of the appellant that "the record of a mortgage of after-acquired property is * * * not notice." While this contention is made under California law, we have seen that the statutes already quoted do not justify such inference.

Furthermore, it is contended by the appellant and his amici curiæ that the company's possession, with "authority to sell and dispose of such after-acquired property, which did not renew or take the place of the property on hand on December 31, 1926, as the company saw fit, is inconsistent with the continuance of a mortgage upon this after-acquired property." Indeed, the amici curiæ even hurl the charge of "fraud" against the company and the appellee.

All three of these contentions—as to recordation, possession by the mortgagor, and fraud—are completely disposed of, according to general law, by the Supreme Court in the case of Etheridge v. Sperry, supra. That case involved two chattel mortgages on a stock of goods in possession of the mortgagor, a storekeeper. The mortgagees sued a sheriff that had levied upon the goods under a writ of attachment. The mortgages included "all goods and merchandise which may hereafter be brought into said store," with the usual warranty of title. With such mortgages before it, the court declared: "Indeed, if this were an open question, we could not be blind to the fact that the tendency of this commercial age is towards increased facilities in the transfer of property, and to uphold such transfers so far. as they are made in good faith; and it is at least worthy of thought, whether the rulings made by the supreme court of Iowa do not tend to make chattel mortgages more valuable for commer-

cial purposes, without endangering the rights of unsecured creditors. The law now generally requires a record of all such instruments, and that, like the recording of a real-estate mortgage, gives notice to all parties interested of the fact and extent of· incumbrances. Why should a transaction like this be condemned, if made in good faith and to secure an honest debt? The owner of a stock of goods may make an absolute sale of them to his creditor, in payment of a debt. If an absolute, why not a conditional, sale, with such conditions as he and his creditor may agree upon? As between the parties no court would question this right, or refuse to enforce the conditions. The interests of the general public are not prejudiced by any such transaction between debtor and creditor. Indeed, they are rather promoted by any arrangement under which the mortgagor can continue in business, for in ninety-nine cases out of a hundred the taking of possession by a creditor results in closing the business, and turning the debtor out of employment. The only parties who can claim to be injuriously affected are unsecured creditors. But they are notified by the record of the exact relations between the mortgagor and mortgagee; and surely subsequent creditors have no right to complain if they deal with the mortgagor with full knowledge of such relations. Existing creditors may of course challenge the good faith of the transaction, but, if they cannot disturb an absolute sale when made in good faith, why should they be permitted to challenge a conditional sale if made in like good faith? The fact that fraudulent relations are· possible is hardly a sufficient reason for denouncing transactions which are not fraudulent. So, if the question were open, or a new one, unaffected by any settled law of the state, we incline to the opinion that the question is not one of law, so much as it is one of fact and good faith, and that the decision of the supreme court of Iowa rests on sound principles. [Many cases cited.]" Pages 277, 278, of 139 U. S., 11 S. Ct. 565, 569.

Accordingly, the decision of the Supreme Court of Iowa in favor of the chattel mortgagees was affirmed.

It is true that, under the law of California, "the stock in trade of a merchant" may not be mortgaged. Section 2955, Civil Code. But in the·instant case it was stipulated that the alleged bankrupt was not a "merchant," and that none of the personal property owned by it or held by the receiver in bankruptcy ·constituted "stock-in-trade of a merchant." Therefore the remarks of the Su-

preme Court are entirely apposite to the case at bar.

See, also, Stratton v. Natural Carbonic Gas Co. (C. C.) 189 F. 928, 929; Title Guaranty & Surety Co. v. Witmire (C. C. A. 6) 195 F. 41, 45; In re Dagwell (D. C.) 263 F. 406, 408.

To recapitulate, then, we conclude that the California statutes are sufficiently general to include chattel mortgages in their provisions authorizing liens on after-acquired property. We further believe that those provisions do not contain, either specifically or inferentially, any exceptions in favor of subsequent purchasers, creditors, or incumbrancers, provided that the mortgages are properly recorded. Finally, the decisions of the California courts and the Supreme Courts of other states, as well as the United States Supreme Court and a number of other federal tribunals, have upheld the validity of chattel mortgages on after-acquired property, even as against subsequent lien creditors.

In the instant case, we see no reason why the decided trend of American jurisprudence should not be followed.

Accordingly, the decree is affirmed.