**HOWELL v. WAR FINANCE CORPORATION.**

**No. 7037.**

Circuit Court of Appeals, Ninth Circuit.

May 31, 1934.

W. E. Ferguson, of Holbrook, Ariz., for appellant.

J. O. Seth, of Santa Fé, N. M., and C. B. Wilson and Orinn C. Compton, both of Flagstaff, Ariz., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

The facts as disclosed by the record are as follows: In the year 1921, E. P. Howell, a cattle grower of Navajo, Ariz., now deceased, sought the assistance of his business associate, Julius Wetzler, of Holbrook, Ariz., in arranging a loan of $25,000, to be used in paying a prior indebtedness of Howell to the Arizona State Bank, of Winslow.

The precise business relations between Howell and Wetzler are not entirely made clear in the record, for it does not disclose the earlier dealings between the two men. In one of his letters to Wetzler, however, under date of August 1, 1921, Howell stated that their business affairs were "badly mixed up."

The earliest exhibit now before us is a letter from Howell to Wetzler, dated July 26, 1921. In that letter Howell said: " * * * there is only one way out. I have a chance to borrow $25,000, providing my financial statement show[s] up all right. Now there is only one way for this to be done, and this is for you to buy back a one-half interest until this $25,000 is paid off, and then I will buy it back, as I do not want to sell, but it['s] our only way to save ourselves, and possibly can get $10,000 on the land. * * * I can pay off $18,000 next year out of steers * * * and possibly [$]5,000 out of odds & ends. You know what this means to us both. * * * I will come down and we will put everything in shape and secure the loan and go ahead with our business."

In his letter of August 1, 1921, Howell elaborated upon the plan:

"Here is the proposition: You would be getting at least 1,000 head of cattle, 300 calves and ½ of all ranch and horses and the increased value of the land for what I owe you, me to buy it back as soon as the mortgage was paid, unless you preferred to keep it. This would make it possible for us to raise the necessary money to pay off the bank and the land. * * *. This would assure you of your money no matter what came up, and I would feel much easier if I knew you were paid, for you will agree with me, that our business affairs are badly mixed up, and if for any reason [they] got into the courts, you and I would get off at the short end.

" * * * Send me the contract to sign. There is no use planning on buying more cattle on time until we get this business entirely straightened out. Then we can get busy and buy all we can, and get down to making

money again. I have studied this from all standpoints, and see no other way out for either of us.

" * * * For I am doing my best to see you get your money out of this outfit."

It appears, however, that Howell's "financial statement" did not "show up all right," for we find testimony by T. M. Quebedeaux, vice president of the Navajo County Live Stock Loan Company, and president of the Arizona State Bank, to the effect that Quebedeaux told Howell that the former believed "Wetzler could make a statement that would warrant my making paper with title to the property."

Be that as it may, on October 7, 1921, a note and chattel mortgage for $28,200 was executed in favor of the Navajo County Live Stock Company by Wetzler. The chattel mortgage covered 2,200 head of cattle, therein specifically described by brands and earmarks, and located on the Ed Howell ranch. The latter instrument was properly recorded on October 18, 1921.

In this connection, it should be stated that, at the trial in the court below, excerpts from a referee's transcript in the case of Wetzler v. Howell, 37 Ariz. 381, 294 P. 611, in the state court, were admitted over the appellants' objections. In these excerpts was contained the following stipulation:

"It is stipulated that prior to the execution of the instrument or contract between the plaintiff [Wetzler] and the defendant [Howell], on November 3, 1921, marked plaintiff's exhibit number two in this case, plaintiff made and executed and delivered to the Navajo County Live Stock Loan Company a second [certain?] note and chattel mortgage upon the live stock involved in this action, which said mortgage was recorded in the office of the county recorder of Apache County, Arizona, on or about the 18th day of October, 1921, and that said note and mortgage was given in lieu of and in payment of and the proceeds used in the payment of the indebtedness evidenced by notes now in evidence in this case.

"Signed by Everett P. Howell and Lillian S. Howell and Julius Wetzler, under date of January 1, 1921, in the principal sum of twelve thousand five hundred dollars—twelve thousand fifty-one dollars, * * * together with the interest on said notes."

Supplementing the foregoing stipulation, it was conceded in open court at the trial below, that the note represented the indebtedness of Mr. and Mrs. Howell to the Arizona

State Bank. And the mortgage from Wetzler to the live stock loan company and that given by Howell to the bank covered the same cattle.

The excerpts from the state proceedings above referred to also contained testimony by Howell that Wetzler "was to pay all indebtedness to the Arizona State Bank." The record herein clearly shows that Wetzler did pay Howell's notes to the Arizona State Bank with the funds derived from the note of October 7.

On November 3, 1921, the Howells executed a bill of sale of the cattle involved in the instant case to Wetzler, for the recited consideration of $50,000. This instrument was recorded in "Book No. 2 of B. of S. Page 142" of the records of Apache county, on November 9, 1921.

The appellee insists that the bill of sale was reduced to writing some time in the month of October, 1921; and, indeed, the document itself bears internal evidence that this surmise is probably correct. We cannot agree, however, with the appellee's similar inference as to the contract, infra, which bears no such internal evidence.

On November 3, 1921, there was executed by Wetzler and Howell a "Contract" upon which both parties herein strenuously rely. This document was recorded on November 4, 1921, in a book of "Agreements and Leases," in the records of Apache county.

The contract or agreement, as it is variously denominated, recites that Howell had on that day conveyed, "by deed, and bill of sale, and assignment of contract," copies of which were thereto attached, certain described real and personal property, the latter including the cattle involved in the instant case.

The agreement also sets forth that Howell shall have the right to repurchase the cattle from Wetzler for $50,000, payable in five years; that "the said transfer is being made only for the purpose of securing" Wetzler "for all sums of money now due" from Howell to Wetzler "and such other sums as may become due under the conditions of this contract"; that Howell shall remain in charge and possession of all the property, except in case of forfeiture as thereinafter provided; and that, where certain brands of stock are mentioned, it shall be understood to cover all increase of said stock, and all sales of increase shall be for the benefit of Howell.

The contract also contains the following provisions:

"All money borrowed hereafter on above described real and personal property to be put back into outfit by purchase of live stock, after payment of balance due on land and Government loan [the loan involved herein], but no purchases are to be made without mutual consent of both parties hereto. O.K. J.W. O.K. E.P.H.

"It is further agreed that the interest on a like amount of the above money owing to the Santa Fé Pacific Railroad Company and to the Navajo County Live Stock Loan Company shall be charged at the rate which" Wetzler "may have to pay said railway company and said loan association on any money borrowed or now owing to them. Interest on balance of said money shall remain as above.

"Outfit not to be mortgaged to exceed $1000,000.00 [$100,000.00?] O.K. J.W. O.K. E.P.H.

"It is further agreed that both real and personal property shall be held by the first party [Wetzler] as full security for both sums hereinabove mentioned as repurchase money and that the second party [Howell] may pay off any part or all of the said money above mentioned at any time, excepting such money as may be borrowed by the first party and which he is bound to keep for a specified time within the term of this contract.

"It is further agreed that all of said property herein above described shall remain as security to cover any and all advances made by the first party for running expenses of the second party and such advances as shall be deemed a part of the repurchase money necessary to be paid each year with the other payments specified, with like interest as above set forth. And the first party agrees to furnish not to exceed Three Thousand Dollars per year for running expenses, as the same may be actually needed; and the first party agrees to deposit $250.00 per month with any bank designated by second party to credit of second party, out of which he shall pay lease money and running expenses; and the second party shall have the right, in the event of the failure of the first party to furnish expenses as aforesaid, to sell cattle to the extent of Three Thousand Dollars per year for the payment of such actual and necessary running expenses.

"The party of the first part hereby agrees to assume and pay all money due to the Santa Fé Pacific Railroad Company on lands hereinabove described, and also all money owing by the second party to the Arizona State Bank of Winslow, Arizona, and the Gallup State Bank of Gallup, New Mexico, and said

payments are included in the above mentioned repurchase money in full."

The day before the bill of sale was recorded, an application for the loan from the appellee was made by the live stock loan company, and, about three weeks later, the latter received the money from the appellee. It will be remembered that the "contract" was recorded five days before the recordation of the bill of sale. It will therefore be seen that both instruments were of record at the time that the appellee advanced the money to the loan company. By the bill of sale, the Howells warranted the title to the live stock that they conveyed to Wetzler; and, in the contract, they authorized the mortgaging of the cattle and realty "not to exceed $100,-000."

At that time, Howell was in possession of the ranch and in control of the cattle covered by the chattel mortgage herein; and he continued so until at least May, 1924, as we shall see, and probably as late as February, 1925. In October, 1921, when a live stock inspector was counting the cattle in connection with Wetzler's mortgage, which had been executed only a few days before, Howell was present, assisted in the counting, and knew why it was being made.

On March 22, 1922, Wetzler renewed his note to the live stock loan company, of October 7, 1921, extending its date of maturity to November 8, 1922; and on the latter date again renewed the note of October 7, 1921, extending the due date of the unpaid balance, $26,700, to November 1, 1924. Both renewals specifically referred to the chattel mortgage, and continued it in effect.

On May 27, 1924, Howell wrote to the appellee complaining that Wetzler had not paid him "a dollar since February 15th, 1922, to care for these cattle." In his letter, Howell made specific "reference to the cattle which are mortgaged to the Navajo County Live Stock Loan Company of Holbrook, Arizona, by Julius Wetzler, the notes which said mortgage covers being discounted with your Corporation," and also to the contract hereinabove summarized. This letter indicates acquiescence and ratification of the note and mortgage executed by Wetzler, on the part of Howell.

On November 23, 1925, the live stock loan company assigned to the appellee the note of October 7, 1921, and the chattel mortgage securing it. This assignment was recorded on February 9, 1926.

For the purpose of correcting the descriptions of the cattle, as set out in the mortgage of October 7, 1921, Wetzler, on March 11, 1926, executed a new chattel mortgage to secure the note of October 7, 1921. This mortgage was filed for record in the office of the county recorder on April 17, 1926.

In the case of Howell v. Wetzler, 32 Ariz. 130, 132, 134, 256 P. 365, decided on May 23, 1927, the Supreme Court of Arizona had before it the contract or agreement heretofore mentioned. The lower court had found it "to be a mortgage for the sum of $100,000, to be paid by Howell to Wetzler, secured by real and personal property therein described," and had rendered judgment that the "mortgage" be foreclosed. The Howell estate appealed, assigning as error that the judgment was conditional, and that the evidence did not support the findings. The nature of the alleged conditions attached to the judgment of the superior court does not concern us here. The Supreme Court reversed and remanded the case, using the following language, which counsel insist is pertinent to the instant case:

"All parties to the action so treated it [the contract as a mortgage], and the court —expressing a doubt as to the correctness of this interpretation—nevertheless, and we think, very properly, under the circumstances shown of record, followed the interpretation of the litigants and decided the case on that theory. * * *

"However, in this case appellant Howell had conveyed the realty, by deeds absolute on their face, to appellee, and although, as between them these deeds were a mortgage, *appellee* [Wetzler] *having the record title could convey to a purchaser for value and without notice a good title, free from the secret mortgage.*" (Italics our own.)

In the case before the state court, Howell v. Wetzler, the controversy was over a deed for part of the mortgaged *real estate,* which had been sold to a third person by Wetzler; and, in the above decision, the question of the sufficiency of the recordation of the contract or "mortgage" was not discussed. Furthermore, the appellee herein was not a party to that action.

The instant case, on the other hand, deals exclusively with the proceeds from the sale of the mortgaged *cattle,* as we shall hereafter; and the appellee herein is strenuously challenging the sufficiency of the recordation of the contract or agreement under "Agreements and Leases."

Nevertheless, both sides contend that the quoted language of the highest tribunal of the

state of Arizona on this subject is significant. We will deal with these contentions hereafter.

On December 30, 1930, the Supreme Court of Arizona decided the case of Wetzler v. Howell, 37 Ariz. 381, 388, 294 P. 611, 614. That was an appeal from an order sustaining a plea in bar by the Howell interests, plaintiffs-appellees therein, to a cross-complaint filed by Wetzler, one of the defendants-appellants in that case. The action was one to quiet title, brought by the appellants herein. They alleged that they were the owners in fee of the *lands* in question; that Wetzler and his codefendants claimed title as mortgagees under the equitable "mortgage" passed upon in the earlier state case, supra; that this mortgage had previously been foreclosed in an action brought by Wetzler against the Howell interests, hereafter referred to as "the Howells"; that the sheriff had sold all the property under the mortgage and decree of foreclosure, Wetzler being the purchaser thereof, and his codefendants being privy in title and claiming under him; that thereafter, as was stated above, the Supreme Court had reversed the judgment of the superior court, and remanded the case for a new trial; and that, when the cause came on for trial, Wetzler, as plaintiff, voluntarily dismissed his suit to foreclose, without reserving any provision that the dismissal was without prejudice.

To the above allegations of the complaint, the defendants Wetzler et al. "filed an amended answer, alleging that they were the owners in fee simple by virtue of the judgment of foreclosure and sheriff's sale," as aforesaid, and that the lands involved had been deeded by Wetzler to certain other named persons, who "were owners" thereof "in fee simple." Wetzler also filed a cross-complaint, seeking to foreclose, as mortgagee, the above "equitable mortgage" against the Howells, as mortgagors, on the lands described in the complaint of the Howells to quiet title, "as also on the cattle covered by the mortgage." The "mortgage" in question was the same that Wetzler had previously foreclosed, which foreclosure suit he had voluntarily dismissed.

The Howells' plea in bar set forth that the equitable mortgage sought to be foreclosed by Wetzler was the same that he had sought to foreclose in the earlier action, and that the decree of foreclosure had been reversed. The plea in bar then recited the facts as to the voluntary dismissal, and further alleged that, under the earlier action and judgment therein. Wetzler had "wrongfully

caused cattle belonging to the cross-defendants [Howell] of the value of $100,000 to be sold," etc. The plea contained other allegations not pertinent hereto, dealing as they did with alleged fraud and conveyances to other persons.

The Supreme Court affirmed the judgment of the lower court, quieting title "in the plaintiffs [Howell] and against the defendants [Wetzler et al.] to the lands described in plaintiffs' [Howells'] complaint."

The present appellee was not a party to any of the state court litigation referred to above. Furthermore, that the later case turned chiefly on the question of the effect of Wetzler's voluntary dismissal of his complaint in foreclosure, and not on the merits of the Howells' title to the land, may be seen from the following two paragraphs, which, in the opinion, immediately precede the order of affirmance:

"It is obvious from the stipulation of the facts and the pleadings in this action that the voluntary dismissal by Julius Wetzler, through his attorneys in cause No. 540 of his complaint in foreclosure, was not because of any defect in the pleadings, want of jurisdiction, or because of any adequate remedy at law, or because he had brought many ill-advised actions, or upon any other ground than that he thought he had all the property described in the foreclosure action, or, having disposed of it to others, could not maintain his action under his mortgage.

"We are satisfied that under this record the voluntary dismissal of plaintiffs' complaint in case No. 540 and the judgment of dismissal thereon by the superior court of Apache county of said cause was a bar to the litigation set forth in the cross-complaint of Julius Wetzler, cross-complainant and appellant in the present action."

Finally, it is to be observed that the judgment in the court below and the judgment of affirmance in the Supreme Court both dealt solely with lands, and not with cattle. Hence neither the subject-matter nor the parties in the second state suit were the same as those in the instant case. The same was true in the first state suit, save that the lower court and the Supreme Court did hold that, *as between the parties,* the contract, which dealt with both real and personal property, was a mortgage.

The present action in equity was instituted in the court below by the appellee on January 4, 1929. The prayer in the complaint was for judgment against Wetzler for $8,-552.98, with interest, which was the **balance**

due on the note. The appellee also prayed that Sidney Sapp, one of the defendants below, be ordered to pay to the clerk of the court the sum of $2,897.19, "as a part of the proceeds of the sale of" the "cattle covered by the mortgages hereinabove described * * * to await" final judgment, etc., "and that upon final judgment * * * the amount so paid into the Clerk of the Court * * * be credited to the amount of principal and interest found to be due plaintiff from said defendant Julius Wetzler." Prayer was also made that all of the defendants, including the appellants, be foreclosed to all right in the mortgaged property; that execution be issued to sell "the said mortgaged property"; and that, if necessary, a deficiency judgment be rendered against Wetzler.

The appellants filed an answer denying that Wetzler was the owner of the cattle, and alleging that the appellants had never given him the right to mortgage the property for them. The answer further set forth that the appellants had not consented to any extension of the note involved in the suit, and that they had not consented to the mortgaging of the cattle to the live stock loan company. The appellants prayed that the mortgage or mortgages be declared null and void, and not creating any lien against the property; and "that the money on deposit with the Clerk in amount of $2,897.19 be declared to belong to the defendants Howell."

The appellants also filed a counterclaim, repeating some of the allegations of their answer, setting forth the execution of the bill of sale and "defeasance contract," already fully summarized above, and referring to the state litigation. Prayer was made "that all moneys [alleged to be about $22,000] received by the plaintiff [appellee, from Wetzler] from the sale of the cattle described in the mortgage and in the plaintiff's complaint be declared to belong to these defendants Howell and to have been and now being held in trust," etc., and for an accounting.

The appellee filed an answer to the counterclaim, denying that the appellants were the true owners of the cattle, and denying that the appellants never authorized Wetzler to execute the mortgage to the appellee. The appellee also alleged that it had no knowledge of the alleged defeasance contract, and that it was not a party to the Wetzler's state foreclosure suit. Denial was made that any sum was wrongfully paid to the appellee by Wetzler or that the appellee was withholding from the Howells any moneys wrongfully paid to it.

The appellee further alleged that it was not obligated to pay to the appellants any proceeds from the sale of the cattle "for the reason that its indebtedness secured by the mortgage of said cattle has not been paid and that the amount still due thereon is greatly in excess of said sum of Three Thousand Dollars so deposited with the Clerk of said Court as aforesaid."

The court below made findings of fact and conclusions of law, and entered a decree in favor of the appellee as prayed for in the complaint.

From that decree the present appeal is being prosecuted.

Much has been said by counsel on both sides as to the question of suretyship in this case. The appellants stoutly maintain that they were merely sureties for Wetzler; "or rather," as they repeatedly revise their statement, "their property was." Indeed, the principal assignments of error cluster about this question of suretyship, partly in connection with parol evidence of the authorization and ratification by the appellants, of Wetzler's mortgage to the appellee, but particularly in connection with the extensions or renewals of the mortgage, without the specific and expressed consent of the appellants.

We need not deal at length with any of these assignments, since we do not believe that either the appellants or their cattle were "sureties" for Wetzler. Our reasons for this view will be developed hereafter.

The appellee, on the other hand, contends that "if the relationship of principal and surety existed at all appellants were principal[s] and Wetzler was surety, notwithstanding the notes were signed by Wetzler."

While it is not necessary, in order to sustain the general position of the appellee, to find that Wetzler was indeed the surety and the Howells were the principals, it will be helpful to examine the appellee's contention; for, if the appellee is correct, and Wetzler was the surety, obviously, under the theory of exclusion, the Howells could not also be the sureties. In this way, we shall be able to dispose of the appellants' contention that they or their cattle were "sureties" for Wetzler's debt.

In Arizona, the common law has been adopted as the rule of decisions. Paragraph 5555 of the Revised Statutes of 1913 (Civ. Code), which were in effect at the time the

rights and obligations herein involved were created, provides: "The Common Law, so far only as it is consistent with, and adapted to the natural and physical conditions of this state, and the necessities of the people thereof, and not repugnant to, or inconsistent with, the Constitution of the United States, or the Constitution or laws of this state, or established customs of the people of this state, is hereby adopted and shall be the rule of decision in all courts of this state."

The general rule is, as to the question of suretyship, not who signed the note, but rather who lent his credit and for whose benefit the loan was made. And the authorities hold that, when the parties to a contract know that one of them is a surety, such a fact may be shown by parol. Lovell v. Potts, 112 Or. 538, 207 P. 1006, 226 P. 1111.

In the leading case of Hoffman v. Habighorst, 38 Or. 261, 63 P. 610, 612, 53 L. R. A. 908, the Supreme Court of Oregon used the following language: "But, within the meaning of the rule under consideration, every one who incurs a liability in person or estate, for the benefit of another, without sharing in the consideration, stands in the position of a surety, whatever may be the form of his obligation. It is true that generally the primary obligor or real debtor joins in the contract with the sureties. This is not, however, believed to be necessary or essential. 'The relation of suretyship,' say the editors of White & Tudor's Leading Cases in Equity, 'grows out of the assumption of a liability at the request of another, and for his benefit. It may, consequently, arise, although the name of the principal does not appear in the instrument which constitutes the evidence of the debt.' 1 Lead. Cas. Eq. (4th Ed.) 149. And in 2 Am. Lead. Cas. (5th Ed.) 441, it is said: 'In this, however, as in other cases, equity has regard to the substance of the transaction. If a promise be made for the benefit of another, without sharing in the consideration, the promisor will be a surety, whatever may be the form of the agreement. * * * The obligation of the surety may be indirect that another shall perform or direct that he will perform himself; he may be jointly bound or appear on the face of the writing as the sole debtor without his being on that account less a surety, or losing the equitable rights which belong to him in that capacity.' And Mr. Chief Justice Cooley, in speaking to the same question, says: 'Now, a surety, as we understand it, is a person who, being liable to pay a debt or perform an obligation, is entitled, if it is enforced against him, to be in-

demnified by some other person, who ought himself to have made payment or performed before the surety was compelled to do so. It is immaterial in what form the relation of principal and surety is established, or whether the creditor is or is not contracted with in the two capacities,—as is often the case when notes are given or bonds taken. The relation is fixed by the arrangement and equities between the debtors or obligors, and may be known to the creditor, or wholly unknown. If it is unknown to him, his rights are in no manner affected by it; but, if he knows that one party is surety merely, it is only just to require of him that in any subsequent action he may take regarding his debt he shall not lose sight of the surety's equities.' Smith v. Shelden, 35 Mich. 42 [24 Am. Rep. 529]."

In Kellogg v. Lopez, 145 Cal. 497, 78 P. 1056, 1057, the Supreme Court of California said: "Upon this state of facts it is clear, at least in this state, that in equity—where 'the form of the instrument may be * * * disregarded'—the parties to the note are to be regarded as mere sureties of the association, and as such entitled to contribution from each other. [Many authorities cited.]" See, also, Hughes v. Ladd, 42 Or. 123, 69 P. 548, 550, 552; Amalgamated Gold Mines Co. v. Ridgely, 100 Wash. 99, 170 P. 355, 356; Lovell v. Potts, 112 Or. 538, 207 P. 1006, 226 P. 1111, 1116; Tennessee-Hermitage Nat. Bank v. Hagan, 218 Ala. 390, 119 So. 4, 9.

If we examine the contract or agreement in the instant case—an instrument that we have already fully summarized—we find that it provides that the transfer of the real and personal property from Howell to Wetzler was "made only for the purpose of securing" Wetzler "for all sums of money now due from" the Howells *to* Wetzler, and not to secure the *appellee* for sums due to it *from* Wetzler; "and such other sums as may become due under the conditions of this contract." Those "other sums" included the Howells' debt that Wetzler agreed to "assume" and "pay," including the amount owing to the Arizona State Bank. As we have seen, Wetzler did pay off the indebtedness to the Arizona State Bank that the Howells had incurred, using therefor the money he had obtained from the appellee's assignor, by virtue of Wetzler's note and mortgage of October 7, 1921.

Accordingly, a careful examination of the record convinces us that, if there was any relation of principal and surety, Wetzler was the surety, for he was assuming and paying

244

a debt for which the appellants were primarily liable.

It is not necessary, however, to resort to the law of suretyship in order to determine the relationship between Wetzler and Howell. The contract, so earnestly relied upon by the appellants, discloses that the cattle were transferred to Wetzler so that he might mortgage them and obtain funds wherewith to pay off the Howells' indebtedness. He held their property in trust, for a particular purpose. He discharged that trust, so far as the record shows, faithfully. As a result, the appellee parted with $28,000, which was, according to the agreement, applied to liquidate the Howells' indebtedness to the Arizona State Bank. We perceive no reason, in law or in equity, why the appellee should not recover the sum thus advanced, out of the proceeds from the sale of the cattle of the Howells, for whose benefit the money was raised.

It will be remembered that the note and mortgage to the appellee from Wetzler were executed before the signing of the bill of sale and the related contract. In other words, at the moment when he made out the note and mortgage, Wetzler had no title to the chattels mortgaged.

It is therefore necessary to inquire whether Wetzler's after-acquired interest in the cattle redounded to the benefit of his mortgagee, the appellee herein.

In the 1913 Arizona Revised Statutes (Civ. Code) at page 1375, we find that title 35, chapter 1, deals with real estate mortgages. In this chapter is found paragraph 4099, which reads as follows: "Title acquired by the mortgagor subsequent to the execution of the mortgage, inures to the mortgagee as security for the debt, in like manner as if acquired before the execution." No such provision is specifically contained in chapter 4 (paragraph 4124 et seq.) which deals with chattel mortgages. Reference to a marginal note to paragraph 4099, supra, however, discloses that the provision has been taken from section 2930 of the Civil Code of California. That section is verbatim the same as the one contained in the Arizona Code.

The California section, however, is found in article 1 of chapter 2 (division 3, pt. 4, tit. 14), which article deals with mortgages in general. It is clear, therefore, that, in the California compilation at least, the provision applies to both real and chattel mortgages.

The identical language found in the 1913 Arizona Code and in the California Code of 1905 has been re-enacted in the Arizona Revised Code of 1928, but under the general heading of "Mortgages and Pledges." We regard this circumstance as somewhat significant, since it indicates that the compilers of the 1913 Code thought it unnecessary to place paragraph 4099, supra, in a separate chapter dealing with mortgages in general, as has been done in the California Code and in the 1928 Arizona Revised Code, chapter 52, § 2310.

Counsel have referred us to no decisions on the subject, but we have been able to find several that bear somewhat upon the problem at hand, both by Arizona and by other courts.

In Kastner v. Fashion Livery Co., 10 Ariz. 23, 27, 85 P. 120, 121, decided in 1906, the court said: "While a chattel mortgage may include property to be acquired after the execution thereof, the language used must be apt and clear to indicate such purpose."

It is to be observed that the Kastner Case was decided under the Revised Statutes of Arizona of 1901, which contained no provision as to after-acquired property, either in connection with real or with chattel mortgages.

The Kastner Case was followed in Hagan v. Cowan, 35 Ariz. 334, 341, 278 P. 68.

In Barron v. San Angelo Nat. Bank, 138 S. W. 142, 144, which dealt with a mortgage on cattle, the Court of Civil Appeals of Texas used the following language:

"As to 'intervening acts,' Lord Bacon laid down the maxim, 'Although the grant of a future interest is invalid, yet a declaration precedent may be made which will take effect on the intervention of some new act.' This is illustrated by possession being delivered to the mortgagee, or his taking possession after acquisition by the mortgagor. Such act is held to relate back to the original grant, and operates as a conveyance of the legal title.

"Equity, however, does not incumber itself with these technicalities, but holds that a mortgage is not a conveyance of the legal title, but only a security for debt. This was first held in Mitchell v. Winslow, 2 Story, 635, Fed. Cas. No. 9,673, and has become the settled American doctrine. * * * It makes no difference that the mortgagee [mortgagor?] did not own the property at the time the mortgage was executed, the mortgage will be treated as a continuing agreement, and upon his subsequently acquiring such property the lien will attach."

This doctrine was also announced by the Supreme Court of Oklahoma in Mitchell v.

Guaranty State Bank, 68 Okl. 110, 172 P. 47, 48:

"We are in accord with the authorities which hold that, in order for a mortgage on after-acquired property to be operative, it must show the intention of the mortgagor to cover the after-acquired property; but where, as in this case, the chattels were acquired by the mortgagor soon after the execution of the mortgage, and were particularly described therein, and there is not any evidence in the record tending to prove that the mortgagor had other property of the same or similar description, or that the mortgage was not intended to cover such property, we think the intent of the mortgagor that the mortgage was to cover such property is sufficiently disclosed.

"The description of the oxen, as contained in the mortgage, is as follows:

" "Two red Polish bulls, 5 years old, broken to work with yoke. Four red steers, 7 or 8 years old, broken to work with yoke.' "

In the instant case, the chattel mortgage describes the animals covered thereby with much greater particularity, by means of brands and earmarks.

The Mitchell Case, supra, is cited with approval in Intertype Corporation v. Strosnider, 88 Okl. 68, 211 P. 1022, 1024, and in Hivick v. Oklahoma-Colorado Oil & Gas Co., 89 Okl. 181, 212 P. 420, 421. The latter case also cites the Kastner decision, supra.

In Elliott on Contracts, § 4867, volume 5, page 999, the following language is used: "But even when void as against creditors and subsequent purchasers, such a mortgage is valid as between the parties thereto and as to others who stand in the same or no better position. And in equity, while such mortgage itself does not pass the title to the property, it creates in the mortgagee an equitable interest in it, which will prevail against creditors and others, although the mortgagee has not taken possession of the property, and the mortgagor has done no new act to confirm the mortgage. The ground of the doctrine is, that the mortgage, though inoperative as a conveyance, is operative as an executory agreement, which attaches to the property when acquired, and in equity transfers the beneficial interest to the mortgagee, the mortgagor being regarded as trustee for him, in accordance with the familiar maxim that equity considers that done which ought to be done."

Similarly, federal courts repeatedly have held that, if the intention to do so is clearly expressed, a chattel mortgage may include after-acquired property.

In Maxwell v. Wilmington Dental Manuf'g Co. (C. C. Del.) 77 F. 938, 939, 940, the court said: "On the principal question of what is necessary to make an incumbrance on after-acquired property, there is no doubt that, in equity, such an incumbrance can be made by a mortgage, or by an agreement between parties, if express terms are used for that purpose, or if it clearly appears, from the language of the instrument, and from the circumstances of the particular case, that such was the intention of the parties. At law a person cannot convey that which he does not own; but it is now well settled that a court of chancery will give effect to a contract to convey future-acquired property, whether real or personal."

Again, in Guaranty Trust Co. of New York v. Minneapolis & St. L. R. Co. (C. C. A. 8) 36 F.(2d) 747, 751, 757, certiorari denied, 281 U. S. 756, 50 S. Ct. 407, 74 L. Ed. 1166, the following statement of the rule is found: "To cover after-acquired property a mortgage should contain either words of futurity, or the language should be such as clearly to show an intention to cover such property. [Many cases, including Maxwell v. Dental Co., supra, cited.]" See, also, Patnott v. Simpson & Co. (C. C. A. 9) 35 F.(2d) 840, 841; Fisher v. Zollinger (C. C. A. 6) 149 F. 54, 57, 59; In re Adamant Plaster Co. (D. C.) 137 F. 251, 256; 11 C. J. § 82, pages 461–462.

Furthermore, if the mortgagor does some new act in furtherance of the original grant, showing an intention to have the property pass thereby, the mortgage becomes valid.

In Barron v. Bank, supra, the court said:

"Appellant submits the following proposition: 'A chattel mortgage upon property not owned by the mortgagor at the date of the mortgage is void, unless some act is done subsequent to the acquisition of title thereto showing a purpose to bring the property within the terms of the mortgage.'

"Even if it be conceded that the law is as above stated, it would afford no reason for setting aside the judgment in this case, for the reason that 'some act was done (by the mortgagee [mortgagor?]) subsequent to the acquisition of title (to said yearlings) showing a purpose to bring the (said) property within the terms of the mortgage.' These acts were: He purchased of the kind of property in said mortgage agreed to be purchased; he put them in the place indicated in said mortgage where they might be found;

and *he branded them as said mortgage indicated they should be branded.*" (Italics our own.)

See, also, 11 C. J. § 47, pages 438, 439.

■ Applying the foregoing principles to the facts in the instant case, we find that Wetzler's mortgage to the loan company—the appellee's assignor—described the cattle in identical terms as those contained in the bill of sale and contract of November 3, 1921, as well in Howell's mortgage to the Arizona State Bank; that Wetzler repeatedly renewed the note and specifically stated that the new notes should be secured by the same cattle; and that the contract authorized, recognized, and ratified Wetzler's mortgage of the Howell cattle.

Therefore equity, which looks not to form but to substance, will recognize the appellee's rights as mortgagee of the Howell cattle, both on the theory of after-acquired property and on the ground that the appellants specifically, and in a formal instrument, authorized and ratified Wetzler's mortgaging of the cattle, for their benefit. They received that benefit, at the appellee's expense; and they cannot now be heard to say that they authorized neither the original mortgage nor the renewals thereof. A court of chancery cannot entertain such a plea. We find no error in the record.

Decree affirmed.