OCONTO LAND COMPANY, Appellant, vs. WALLSCHLAEGER, Respondent.

*December 16, 1913—January 13, 1914.*

*Sales:* Bona fide *purchaser: Conditional sale of timber: Estoppel: Notice: Ordinary course of business.*

1. A conditional vendor who, having given to the vendee possession and apparent authority to sell the property, either expressly or impliedly consents to such sale by the vendee, will be estopped from asserting his rights to the injury of a purchaser

who bought in the ordinary course of business and paid for the property without notice.

2. The mere fact that about one third of the purchase price of lumber was paid by applying thereon a precedent debt of the vendor for advances made to him by the vendee for the purpose of paying for stumpage and secured in part by an executory contract for the sale of the lumber in the following season at the market price, did not render such sale, when consummated, one out of the ordinary course of business.

3. Knowledge by the purchaser of lumber that the vendor was logging on land which did not belong to him, was not notice that the timber so being cut was not paid for or that its sale to said vendor was conditional with title reserved in the owner of the land.

APPEAL from a judgment of the circuit court for Manitowoc county: JAMES WICKHAM, Judge. *Affirmed.*

The plaintiff brought replevin against the defendant for a quantity of lumber, which was delivered on the replevin process and bond to the plaintiff. A verdict for defendant found the value of this lumber at the time the action was commenced to have been $6,621.92, and for this sum, less $370.74 with interest and costs, judgment went for the defendant. The plaintiff claimed title to the lumber by virtue of its ownership of certain lands and a contract relative to the timber thereon as follows:

"The *Oconto Land Company* of the first part, for and in consideration of nine thousand dollars to me paid by Wm. Swenty of Marinette Co. Wis. of the second part, the receipt whereof is hereby acknowledged, have bargained, sold, granted, transferred, assigned and conveyed; and by these presents doth bargain, sell, grant, transfer, assign and convey unto the said party of the second part, his executors, administrators and assigns, all the timber standing & being on the following described lands in Marinette & Oconto Co. with the right to enter upon said lands & remove the same any time within two years, the title to said timber to remain in first party till two certain notes are paid one for $5,000 & the other for four thousand. Land is described as follows," etc.

This contract was signed August 4, 1909, by the plaintiff and William Swenty.    There was a verdict as follows:

"(1) Did the defendant purchase the lumber in question from William Swenty in good faith, without any notice of the plaintiff's title thereto?    A. Yes.

"(2) Did Louis Belongia on March 14, 1910, notify the defendant that the plaintiff had title to the lumber?    A. No.

"(3) Was the defendant notified of the plaintiff's title to the lumber at the interview in the office of George Beyer at Oconto about the last part of April, 1910?    A. No.

"(4) If you answer each of the questions (2) and (3) No, then answer this: Did the defendant have any notice of the plaintiff's title to the lumber before the time when he received such notice at Coleman in the early part of May, 1910?    A. No.

"(5) Did plaintiff authorize William Swenty to sell the lumber to the defendant free from the plaintiff's claim thereto?    A. Yes.

"(6) At the interview in the office of George Beyer in the latter part of April, 1910, did said Beyer acquiesce in the sale of the lumber by Swenty to defendant and consent that such sale should be free from the plaintiff's claim to the lumber?    A. Yes."

For the appellant there was a brief by *Classon & O'Kelliher,* attorneys, and *Greene, Fairchild, North, Parker & McGillan,* of counsel, and oral argument by *D. G. Classon* and *J. B. North.*

For the respondent there was a brief by *Kittell & Burke,* and oral argument by *J. A. Kittell.*

TIMLIN, J.    The value of the lumber in controversy was $6,621.92 after it had been manufactured, hauled, and when ready for market.    The labor liens thereon were $4,000 and the plaintiff's claim for stumpage was $9,000.    But there was included in this $9,000 some pre-existing indebtedness of Swenty to the plaintiff.    Deducting this at the highest amount claimed and we still have the amount due for stumpage about equal to the manufactured value.    The $370.74

deducted from defendant's recovery was the difference between the stipulated market value of the manufactured lumber and the amount paid out by the defendant before he had knowledge or notice of the plaintiff's claim according to the verdict.

It is conceded that the verdict supports the judgment but contended that the evidence does not support the verdict. We find uncontroverted evidence that there was an interview between the defendant and Swenty and Mr. Beyer, representing the plaintiff, at the office of Mr. Beyer in the latter part of April, 1910, after the sale by Swenty to the defendant and after defendant had paid $5,600 on the lumber in the manner hereinafter stated and before the defendant had paid the last $500. It was also uncontroverted that on April 13, 1909, defendant advanced to Swenty $2,100 and that Swenty agreed to sell defendant his next winter's cut of lumber at the market price, the money so advanced to constitute a part payment therefor. During the winter of 1909 and 1910 Swenty entered upon the land described in the aforesaid agreement and cut and removed therefrom and had in his exclusive possession a quantity of the growing timber so purchased which he had sawed into lumber, and this is the lumber in question. It is also uncontroverted that on March 11, 1910, pursuant to the agreement of the year before, Swenty sold and delivered this lumber to defendant at prices then agreed upon, and that there were labor claims unpaid against the lumber which defendant was to pay off as part of the purchase price, and that between March 11, 1910, and the meeting in Mr. Beyer's office defendant paid off $3,500 of these labor claims, and within a week after the said meeting paid out $500 more, making a total, with the advance of $2,100 mentioned, of $6,100. The labor claims so paid were, under the law, a lien prior and paramount to the interest of the plaintiff or that of Mr. Swenty in the lumber. Mr. Beyer testified that at the interview in April,

1910, between himself, Swenty, and the defendant, at which others were present, he knew defendant had bought the lumber from Swenty and therefore did not ask about it, and that he knew the labor claims were a lien thereon and that the defendant had paid some, and he thinks defendant said there were more to pay, and he admits that he said nothing about the plaintiff having any claim on the lumber. Defendant, on the other hand, testifies that at this interview he informed Beyer that he had bought the lumber from Swenty, and Mr. Beyer asked if the labor claims on the lumber were paid; whereupon defendant informed Beyer that he had paid $3,500 on these labor claims and there was about $500 additional labor claims outstanding which would come in. So that, rejecting controverted points for the present, we have here an admission on the part of Beyer that he knew defendant had purchased this property, had paid some labor claims thereon and was about to pay more, and that he did not mention that he had any claim upon or interest in the lumber, or object to this payment, but waited until defendant had paid the remainder of the labor claims. Beyer is apparently conscious that this would not be fair dealing and makes the excuse that he had some time before sent up one Belongia to notify the defendant that the plaintiff owned the property, and that Belongia informed Beyer he had done so. But the jury, upon a substantial conflict of evidence, negatived this evidence of notice through Belongia. Again, Beyer testifies that he authorized Swenty to sell this lumber, only stipulating that Swenty notify him. His exact words were: "I did not care whom he sold it to so long as the party was responsible. I wanted him to notify me, then I would know whom he sold it to, and I wanted to notify the party that I had a claim in that for so much money."

If Mr. Beyer's company had an absolute title and authorized such sale, and the person so authorized, having possession and apparent ownership, sold under that authority

but in violation of the undisclosed condition of its exercise
or limitation thereon to the effect that Swenty should notify
plaintiff of the sale, and the purchaser had no notice of this
limitation and bought the property in good faith, we would
have a very ordinary case of one intrusted with the posses-
sion of personal property with authority to sell the same,
limited only by the requirement in force between the owner
and agent but unknown to the purchaser that the selling
agent in possession should inform the owner of the name of
the purchaser so that the owner might notify the latter of the
owner's interest therein. *Young v. Wright,* 4 Wis. 144;
*Cowie v. Nat. Exch. Bank,* 147 Wis. 124, 132 N. W. 900,
and cases cited in opinion. But the testimony of Mr. Beyer
also went beyond this, and fairly bears the interpretation that
there was no condition or limitation imposed upon Swenty's
authority to sell the lumber, and that he, representing the
plaintiff, permitted Swenty to sell the lumber to whom and
how he pleased, the plaintiff looking to Swenty, instead of
to the purchaser from Swenty, for its pay. This phase of
the evidence was responded to by the fifth finding of the
special verdict to the effect that plaintiff authorized Swenty
to sell the lumber free from the plaintiff's claim. It is con-
tended that there is no evidence to support the verdict in this
particular, but we think some such evidence is found in the
admissions of Mr. Beyer and in the circumstances attending
the transaction, such as the omission to mark the lumber, the
act of investing Swenty with authority to sell the amount of
the labor claims, and Mr. Beyer's acts and conversations with
reference thereto, as well as the peculiar contract, by which,
according to some of the testimony of Mr. Beyer, plaintiff
sought to protect itself. This was to the effect that Swenty
had the right to fix the selling price and to sell when and to
whom he chose, which would naturally authorize Swenty to
receive the purchase money, if the sale was for cash.
Swenty was to notify Beyer of the person desiring to pur-

chase, or the person who had purchased, so that Beyer could notify the latter that the plaintiff had title to the logs. But this would leave Swenty at liberty to take the money of the purchaser and Beyer at liberty to trust Swenty to pay it over to him and so protect the cash purchaser, or to keep it and let Beyer deal with the purchaser. This is not well ex- plained by any of the testimony, and it is a circumstance from which, with the other testimony on the part of Beyer, the jury might infer that there was really no such limitation placed upon Swenty's authority.to sell as Mr. Beyer testified. Mr. Swenty testified that he did notify the defendant of this stipulation and that the purchase price of the timber, or the stumpage as it is called, should be paid. The defendant de- nied this, and the jury responded to this evidence by the answers to the first, third, and fourth questions of the special verdict.

The appellant contends that the lumber was not bought in the ordinary course of business, and bases that contention upon the fact that the $2,100 advanced in April, 1909, was a transaction outside of the ordinary course of business. The defendant testified that at the time he advanced this $2,100 he was informed by Swenty that the latter had bought so much stumpage he could not cut it all during the winter of 1908–1909 because the winter was too short, and asked for the advance to enable him to pay for the whole of the stumpage and cut the remainder the next winter. A con- tract in writing was then made acknowledging receipt of this $2,100 and agreeing to sell to the defendant on board cars at a designated station Swenty's lumber to be sawed in the winter of 1909 and 1910, consisting of about 600M feet of Norway and white pine, the defendant to pay for such lumber the market price as it would be between the dates of January 1, 1910, and April 1, 1910. If this advance and this contract stood alone there might be ground for appel- lant's contention. But as an advance payment and an ex-

ecutory contract closed out afterward by actual sale and delivery of the lumber at its market price and a payment of $4,000 additional, there does not seem to us to be anything extraordinary or unusual in the transaction. It first took the form of a loan in part secured by an executory contract of sale at the market price, to be closed or concluded by the payment of the full market price, the purchaser having credit thereon for his advance of $2,100 to Swenty for the purpose of buying the standing timber. Ordinarily it is the last or closing act of the transaction that determines the nature of the purchase and the rights of the parties under it. If defendant at that time paid out $4,000 for the lumber, his title thereby and at that time acquired could not be avoided merely because another third of the purchase price was paid by giving Swenty credit on a pre-existing indebtedness. *Shufeldt v. Pease,* 16 Wis. 659; *Carey v. Dyer,* 97 Wis. 554, 73 N. W. 29.

The defendant had reason to know and did know that the land upon which Swenty was logging in the winter of 1909 and 1910 did not belong to Swenty, hence that the latter bought the timber from some one else. But this cannot be considered notice that Swenty did not pay for the timber or that the sale was conditional, reserving title in the vendor. He had been informed, and had no reason to doubt, that the $2,100 which he advanced to Swenty had been used in the purchase of stumpage and that Swenty had in addition stumpage left over from the year before. The evidence in this case supports the verdict and brings the case within the rule of *Mississippi River L. Co. v. Miller,* 109 Wis. 77, 85 N. W. 193, and *Wing v. Thompson,* 78 Wis. 256, 47 N. W. 606. In the former case it was said:

"The simple principle is that if the conditional vendor, having given the vendee possession and apparent authority to sell the property, either expressly or impliedly consent to such sale by his vendee, he will be estopped from asserting

his rights to the injury of a purchaser who bought in the ordinary course of business, and paid for the property without notice."

The only substantial contention of the appellant in the instant case with reference to *Mississippi River L. Co. v. Miller, supra,* is that the instant case is without the rule of the former case because the property was not bought in the usual course of business. The jury having upon evidence found that Swenty had authority to sell, and this court having arrived at the conclusion that there was nothing out of the usual course of business in plaintiff's purchase, the two cases last cited also control the determination of the instant case and require an affirmance of the judgment.

*By the Court.*—Judgment affirmed.