COLONIAL FINANCE COMPANY, INC. *v.* EMILE DeBENIGNO

MALTBIE, C. J., HINMAN, AVERY, BROWN and JENNINGS, Js.

Argued June 7—decided July 12, 1939.

*Bertrand B. Salzman,* with whom was *Elliott R. Katz,* for the appellant (plaintiff).

*James C. Shannon,* for the appellee (defendant).

AVERY, J. The plaintiff brought this action to recover the possession of an automobile delivered to the Bethel Motor Sales, Inc., on February 7, 1938, under an agreement of trust in accordance with § 767d of the 1937 Supplement to the General Statutes, the "Uniform Trusts Receipts Act." The plaintiff, engaged in financing automobile sales, occupies the position of an "entruster" under the act and claims the right to repossess the car in order to effectuate its security. The Bethel Motors occupied the position of "trustee" under the act. By its terms, where a trustee has liberty of sale and sells to a buyer in the ordinary course of trade, the buyer takes the property free from the entruster's security interest, and no limitation placed by the entruster on liberty of sale granted to the trustee affects a buyer in the ordinary course of trade unless the limitation is actually known to him. § 767d, I., 2 (a). On February 17, 1938, the automobile was delivered to the defendant and the plaintiff

contends this was contrary to the terms of the trust receipt, and that the defendant, who was a subdealer of Bethel Motors, was not a "buyer in the ordinary course of trade" within the meaning of the act.

The material facts are these: The plaintiff, a finance company, filed with the secretary of state in accordance with the Uniform Trusts Receipts Act a statement of trust receipt financing stating that it expected to be engaged in financing automobiles with the Bethel Motors Sales, Inc., an automobile distributor. The defendant is a subdealer in Graham automobiles of Bethel Motors. The defendant operates under an agreement to which both the manufacturer of the car, the Graham Paige Motor Corporation, and its distributor, Bethel Motors, are parties and which gives it the exclusive right to sell automobiles manufactured by the corporation in the town of Wilton. The contract regulates to some extent the methods of the defendant in conducting the business, provides that the manufacturer may make certain charges in connection with the sale of cars which would be in addition to the net price, that is, the list price less the prevailing discount, and specifically states that the relation between the parties is that of vendor and vendee, not principal and agent. On February 7, 1938, the plaintiff forwarded to the Graham Paige Motor Corporation its draft in payment for the car in suit which was in Detroit, Michigan. At the same time Bethel Motors Sales, Inc., executed and delivered to the plaintiff a bill of sale and the plaintiff then placed the car in the possession of Bethel Motors under a trust receipt in accordance with the statute. On October 9, 1936, the defendant purchased from Bethel Motors an automobile for which he paid the wholesale price of $929.01. The car was claimed to be defective and the defendant agreed with Bethel Motors that it might be sold by

the latter and the balance applied on the purchase of another. Accordingly it was sold by Bethel Motors and the defendant credited upon its books in the amount of $929.01.

On November 12, 1937, the defendant ordered a new 1938 Graham sedan from Bethel Motors and on February 9, 1938, the president of the company told the defendant his car had been shipped. In the trust receipt it was provided that the Bethel Motors might exhibit the car and, having obtained the written consent of the plaintiff, might sell it for cash for not less than the minimum sale price specified in the receipt, being accountable to the plaintiff for the proceeds of the sale. The defendant then gave his check for $182.36 and received a bill of sale for the car at wholesale cost of $1112.37, the balance being made up by the credit then standing on the books as of October 1, 1937. The car arrived to Bethel Motors on February 13, 1938, and was allowed to remain in their salesroom until February 17, 1938. On that day the defendant drove to the salesroom and took possession of the automobile. Sometime previous Bethel Motors had been in difficulties and on that day the state police seized the records and books of the concern, shortly after the defendant obtained possession of the automobile. At the time the defendant called for his automobile the president of the company was not present but the defendant met him and both drove back to the garage of the company, where, after some talk, the defendant left and drove the car to his place of business. The defendant knew that Bethel Motors financed some of its automobiles with finance companies and some of the cars which it procured were subject to finance liens, but had no knowledge that the company was engaged in trust receipt financing with the plaintiff or with any other finance company,

and had no actual knowledge of any limitation placed upon the liberty of sale of Bethel Motors. The defendant at all times acted in good faith.

The plaintiff contends that the defendant was not a buyer in the ordinary course of trade because that term does not include a transaction between a distributor and one of its agents or subdealers, but is intended to cover transactions with the ultimate consumer. It is further contended that the defendant was not a purchaser for new value because the car was obtained as a result of an exchange or settlement of a claim which the defendant had against Bethel Motors. By the statute a buyer in the ordinary course of trade is defined as "a person to whom goods are sold and delivered for new value and who acts in good faith and without actual knowledge of any limitation on the trustee's liberty of sale, including one who takes by conditional sale or under a pre-existing mercantile contract with the trustee to buy the goods delivered, or like goods, for cash or on credit." This is followed by the limitation that it shall not include a pledgee, a mortgagee, a lienor or a transferee in bulk. According to the construction placed on the act by the plaintiff, the only transactions covered would be those in retail trade. There is a scarcity of decisions upon this precise point. The subject of trust receipts was considered in the *New Haven Wire Co. Cases*, 57 Conn. 352, 384, 18 Atl. 266, and *Armstrong* v. *Greenwich Motors Corp.*, 116 Conn. 487, 491, 165 Atl. 598. Both of these cases, however, were decided before the present statute became effective and are of no assistance in the solution of the problem before us. There is nothing in the language of the act which requires such a construction, nor upon the facts as found are we enabled to rule as a matter of law that the trial court was in

error in concluding that the defendant was a buyer in the ordinary course of trade.

The phrase "in the ordinary course of trade" or some equivalent was in current use before the adoption of either the Uniform Conditional Sales Act or the Uniform Trusts Receipts Act, particularly in connection with a quite widely recognized principle that where a conditional vendor had expressly or impliedly given the vendee authority to sell the article he could not assert rights under the instrument against a bona fide purchaser from the vendee "in the ordinary course of trade"; the phrase quoted became a part of the Uniform Conditional Sales Act which followed this principle in this respect; 2 Uniform Laws Annotated, Conditional Sales Act, p. 15, § 9; and apparently the phrase passed from that act into the Uniform Trusts Receipts Act. As the basis of the principle was the express or implied authority given to the vendee to sell the articles, it followed that sales within the limits of that authority would be protected and these would include transactions which were actually or presumably sales within the intent of the parties. *O'Laughlin* v. *Jennings Co., Inc.,* 107 Conn. 365, 368, 140 Atl. 758; *Spooner* v. *Cummings,* 151 Mass. 313, 315, 23 N.E. 839; *Rogers* v. *Whitehouse,* 71 Me. 222, 225; *Flint Wagon Works* v. *Maloney,* 26 Del. (3 Boyce) 137, 149, 81 Atl. 502; *Columbus Buggy Co.* v. *Turley & Parker,* 73 Miss. 529, 536, 18 So. 232; and see *Lewis* v. *McCabe,* 49 Conn. 141, 150; *New Haven Wire Co. Cases,* 57 Conn. 352, 392, 18 Atl. 266. Within the principle would fall sales made in the ordinary course of trade, that is, such sales as, under the circumstances, the vendee would make in pursuance of the usual custom in the business. *Trousdale* v. *Winona Wagon Co.,* 25 Idaho 130, 134, 137 Pac. 372; *De Cozen Motor Co.*

v. *Kaufman,* 113 N. J. L. 343, 347, 174 Atl. 893; 1 Mechem, Sales, § 601.

Where the principle was held not to apply, the transactions were of a nature quite different from those usual in the ordinary conduct of the business in which the vendee was engaged. In a number of cases it was held, although there was authority to the contrary, that one who bought the entire stock of goods of a vendee was not protected; *Burbank* v. *Crooker,* 73 Mass. 158; *Bass, Heard & Howle* v. *International Harvester Co.,* 169 Ala. 154, 159, 53 So. 1014; and see *Romeo* v. *Martucci,* 72 Conn. 504, 511, 45 Atl. 1. Other instances where a transaction was held not to be in the ordinary course of trade were where a stock of goods was turned over to certain persons who had become indorsers upon a note of the vendee; *Pratt* v. *Burhans,* 84 Mich. 487, 489, 47 N.W. 1064; where there was merely a sham sale by the vendee; *Ufford* v. *Winchester,* 69 Vt. 542, 38 Atl. 239; and where a factor bargained his entire stock of goods for land in another state. *Potter* v. *Dennison,* 10 Ill. 590. In *Oconto Land Co.* v. *Wallschlaeger,* 155 Wis. 418, 144 N.W. 979, it was held that the fact that a part of the purchase price for the sale of timber was paid by applying advances which had been previously made to buy stumpage rights and which were secured by an executory contract of sale to be made the next season at the market price did not take the case out of the rule, but it was suggested that had the lumber been delivered solely under the original contract the purchaser might not have been protected.

In the case before us the trial court has found that the defendant was a buyer in the ordinary course of trade. The contract under which he was acting as a subdealer was a printed form evidencing the fact that, at least as regards the Graham Paige Motor Corpora-

tion, it was one ordinarily used by it and its dealers. Certainly we cannot, upon this record, hold that the trial court could not reasonably conclude that a purchase by a subdealer made in good faith from a dealer under such a contract as the one before us was not a customary method for the sale of cars in the automobile industry. It was one, then, which was made in the ordinary course of trade. It is significant in this connection that the Trusts Receipts Statute of 1935, Cum. Sup. 1935, § 1574c, specifically limited the protection to those purchasing at retail sale, but no such limitation is contained in the present statute which repealed the statute of 1935. In support of the contention that a retail dealer is not a buyer in the ordinary course of trade, the plaintiff places great reliance upon *Colonial Finance Co.* v. *McCrate,* 60 Ohio App. 68, 19 N. E. (2d) 527, a case which held, under the law of Ohio, that an innocent purchaser for value from a retail dealer of an automobile displayed upon the dealer's salesroom floor for sale is protected under the laws of that state against a mortgagee under a chattel mortgage from the dealer, but that another retail dealer would not be so protected. This decision was based upon certain provisions in the statute distinguishing between the sale of a new car by a dealer to a dealer and by a dealer to a member of the buying public and is of no aid in determining the meaning of the phrase, "buyer in the ordinary course of trade" as used in the Uniform Trusts Receipts Act.

The plaintiff also contends that an antecedent debt was not new value within the meaning of the law and the only value given was $182.36 which is not a full or fair price for a car worth over $1000. The statute provides that new value shall "include new advances or loans made, or new obligations incurred, or the release or surrender of a valid and existing security interest,

or the release of a claim to proceeds under subsection J; but 'new value' shall not be construed to include extensions or renewals of existing obligations of the trustee, nor obligations substituted for such existing obligations." The act does not attempt an inclusive definition of new value. It goes no farther than to specify that certain things shall be and other things shall not be regarded as within that term. It does not, for example, state that cash actually paid in full satisfaction of the price of an article constitutes such value. The act defines value as "any consideration sufficient to support a simple contract" and that "an antecedent or pre-existing claim, whether for money or not, . . . constitutes value when goods . . . are taken either in satisfaction thereof or in security therefor." At the time of the sale of defendant's car and the ordering of a new one in November a new obligation was incurred. The arrangement was for Bethel Motors to sell the defendant's car on his account and to sell him a new car for the sum realized therefor with a cash payment from him to balance the difference in price. When the defendant bought the car involved in this action the application of the debt owed him by the Bethel Motors to the purchase price necessarily involved the satisfaction of the indebtedness and constituted a present value then passing to the seller. It was new value within the terms of the act.

As to the claim that the knowledge of the subdealer that his distributor was engaged in automobile financing constituted knowledge that the automobile in suit was subject to trust receipt financing, the finding is that the defendant had no actual knowledge of any limitation placed by the defendant on the liberty of sale of Bethel Motors, and the trial court concluded that the defendant had no notice, actual or constructive, of the trust receipt transaction between the

parties. Whether or not the term "actual knowledge" in the statute is restricted to knowledge in fact as distinguished from knowledge imputed by reason of acts and circumstances known to the purchaser, at least the conclusion of the court that the defendant did not have constructive notice in this case is one which it could reasonably reach.

There is no error.

In this opinion the other judges concurred.