**GENERAL ELECTRIC CREDIT CORPORATION, a corporation, Plaintiff,**

v.

**R. A. HEINTZ CONSTRUCTION CO., a corporation, Defendant,**

**R. A. HEINTZ CONSTRUCTION CO., a corporation, Third-Party Plaintiff,**

v.

**GENERAL ELECTRIC CREDIT CORPORATION, a corporation; James E. Wagner, Trustee in Bankruptcy for Fincham Equipment Co., Inc., a corporation, Bankrupt; Ingersoll-Rand Financial Corporation, a corporation and Winslow Construction Co., a corporation, Third-Party Defendants.**

**Civ. No. 67–379.**

United States District Court
D. Oregon.

June 10, 1969.

Boyd J. Long, Boyrie, Miller & Long, Portland, Or., for plaintiff and third-party defendant.

Jack L. Joyce, Kobin & Meyer, Portland, Or., for defendant and third-party plaintiff.

William M. McAllister, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for Ingersoll-Rand Financial Corp., third-party defendant.

## OPINION AND FINDINGS

KILKENNY, District Judge:

This is an action to determine the rights of the respective parties in two Euclid 71 TD dump trucks (71's) and two Euclid dump 65 TD hauling trucks (65's).

General Electric Credit Corporation (GECC) is a New York corporation. R. A. Heintz Construction Co. (Heintz) is an Oregon corporation. Ingersoll-Rand Financial Corporation (Ingersoll) is a Delaware corporation. Fincham Equipment Co., Inc. (Fincham) is an Oregon corporation and is now in bankruptcy. Its trustee has disclaimed all interest. Jurisdiction exists by virtue of 28 U.S.C. §§ 1441, 1332, 1335 and 2361.

Fincham was engaged in selling and renting new and used equipment. In April, 1966, it purchased the two 71's previously mentioned. At the time it was doing business in Adams County, Colorado, and purchased the equipment in that county. Subsequently, on May 18, 1966, Fincham, for value, executed a note to Ingersoll for $61,600.00. To secure payment of the note, it executed a chattel mortgage on the 71's. This chattel mortgage was filed for record in Adams County, Colorado, on May 27, 1966. The filing was in accordance with Colorado law. This security interest was acquired in good faith and without knowledge of claimed ownership by others.

Fincham, on June 24, 1966, for value executed and delivered to GECC its promissory note. To secure said note, it executed and delivered to that corporation a chattel mortgage creating a lien on certain equipment not involved in this litigation. The said chattel mortgage was filed for record with the County Clerk and Recorder of Adams County, Colorado, on June 29, 1966.

Heintz, on January 25, 1967, in good faith and without actual knowledge of the alleged security interest of Ingersoll, purchased the 71's from Fincham for the sum of $64,000.00. At the same time, and as part of the same transaction, Heintz traded the two 65's to Fincham and received a credit of $27,000.00 against the purchase price of the two 71's. Heintz is a buyer in the ordinary course of business as to this amount. Fincham, on January 25, 1967, was indebted to Heintz in the sum of $10,000.-00, for the balance of the purchase price on a Cat Loader and was indebted to Heintz-Kaiser, a joint venture, in the amount of $4,459.68 on tires and those amounts were credited on the purchase price of the two 71's. Heintz, on February 2, 1967, delivered to Fincham a check for the balance of $22,540.32. Heintz is a buyer in the ordinary course of business as to this amount.

Fincham did not have Ingersoll's written consent to sell the 71's. The 71's were shipped from Denver on February 4, 1967, and shortly thereafter received by Heintz in Redding, California.

Later, on March 10, 1967, Fincham and GECC signed an agreement designated a Partial Release and Substitution of Equipment in Chattel Mortgage, in which the two 65's were substituted for certain of the collateral covered by the above chattel mortgage. This instrument was filed on March 13, 1967, with the proper officer for the County of Adams, Brighton, Colorado.

At the time GECC obtained its alleged security interest in the 65's, it did so for value in good faith and without actual knowledge of any claim of ownership or interest of the other parties in or to the 71's or the 65's.

The Uniform Commercial Code's (UCC) effective date in Colorado was July 1, 1966.

The Code's financing statements reflecting Fincham as debtor and GECC as secured party were filed March 27, 1967, with the Secretary of State of the State of Oregon and the proper officer of Multnomah County, Oregon. At-

tached to the financing statements, and made a part thereof, were copies of the chattel mortgage and the partial release and substitution of equipment, previously mentioned.

Jack Fincham, President of Fincham, died on March 16, 1967. At that time, Heintz was in physical possession in Oregon of the two 65's and did not voluntarily surrender possession. GECC instituted a claim and delivery action in the Oregon courts against Heintz for possession of the 65's and caused an Oregon sheriff to seize possession. Heintz, learning that defendant Winslow Construction Co. (Winslow) and Ingersoll claimed interest in the 71's, removed the state case to this Court and filed a third-party complaint seeking a determination of the interests of the respective parties. GECC received possession of the 65's by posting a surety bond in the amount of $50,000.00 in the state proceeding. GECC later sold the 65's for a price of $14,000.00.

As of July 10, 1967, Fincham was indebted to GECC in the sum of $50,697.61. On March 31, 1967, Fincham was indebted to Ingersoll in the sum of $43,458.83. On July 10, 1967, the value of the two 65's did not exceed $14,000.00. Fincham was in default on the dates above mentioned.

## ISSUES

The issues of fact as stated in the pre-trial order are:

(1) When did R. A. Heintz Construction Co. obtain actual knowledge of the interests of the various parties in the 71's and 65's?

(2) Was R. A. Heintz Construction Co. a buyer in the ordinary course of business?

(3) Was R. A. Heintz Construction Co., subsequent to February 4, 1967, retaining physical possession of the two 65 TD's at the sufferance of Fincham Equipment Co., and awaiting instructions from Fincham specifying to which point shipment should be made?

The issues of law as therein stated are:

(1) Did General Electric Credit Corporation acquire any interest in the 65's by virtue of its agreement dated March 10, 1967?

(2) If Ingersoll-Rand acquired any interest in the 65's by reason of these 65's being a part of the proceeds of the sales of the 71's, was that interest cut off by the acquired interest of General Electric Credit Corporation?

(3) Are Ingersoll-Rand's rights in the 71's and the 65's governed by the Colorado Pre-Code Law?

(4) Is the interest of General Electric Credit Corporation in the 65's governed by the Oregon Uniform Commercial Code?

(5) Are the rights of R. A. Heintz Construction Co. to the 65's governed by the Uniform Commercial Code?

(6) Was Heintz a buyer buying in the ordinary course as to the entire purchase price or just to that portion represented by the cash and trade-in?

(7) In the event that R. A. Heintz Construction Co. is not the owner of the 71's free and clear of any claim of Ingersoll-Rand, does it have a right in the 65's superior to that of General Electric Credit Corporation?

## HEINTZ'S RIGHTS TO THE 71'S

■■ Although GECC contends that Oregon law is applicable and is the measure of Heintz's rights, I can find nothing persuasive in its argument. The Oregon law on conflicts, ORS[1] 71.1050, and the controlling Federal cases, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and Getlin v. Maryland Cas. Co., 196 F.2d 249, 50 A.L.R.2d 73 (9th Cir. 1952), point in the opposite direction. The Oregon statute requires that the state's Uniform Commercial Code be applied where the parties to the transaction have not indicated what law is to govern and if the transaction bears an appro-

---

1. Oregon Revised Statutes.

priate *relation to the state.* Obviously, the mere fact that an action is prosecuted in the state does not require the courts to apply the state's substantive law. I interpret the language "appropriate relation" as meaning essentially the same thing as the more common phrase "significant contacts". In general, the Oregon Supreme Court holds that the law of the state which has the most significant contacts with the occurrences and the parties is determinative of all rights and liabilities. DeFoor v. Lematta, 86 Or.Adv.Shts. 169, 437 P.2d 107 (1968); Casey v. Manson Construction & Engr. Co., 247 Or. 274, 428 P.2d 898 (1967); Lilienthal v. Kaufman, 239 Or. 1, 395 P.2d 543 (1964). I have no difficulty in finding that all, or practically all, of the "significant contacts" in this transaction took place in the state of Colorado. The 71's were located in that state at the time of the transaction. The seller's place of business was in Colorado and the agreement was reached in Colorado. Only payment by mail and later delivery of the 71's took place outside of that state. Under the Oregon decisions, the Colorado law must be applied. It can well be argued that this issue is academic and of no importance in that both Oregon and Colorado have enacted the UCC and that the provisions to be here considered are identical.

Ingersoll seems *to contend that* pre-UCC Colorado law determines Heintz's rights in the 71's. It also relies on the UCC. Inasmuch as Heintz's rights to the 71's were established when it made the purchase from Fincham in January, 1967, some six months after the Colorado Code went into effect, the pre-code rights are here of no significance.

CRS[2] 155–2–403(2) provides:

"Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business."

Ingersoll concedes that under this section, as well as under pre-UCC Colorado law, Moore v. Ellison, 82 Colo. 478, 261 P. 461 (1927), and the Colorado Inventory Chattel Mortgage Act, CRS 1963 21–2–7, Heintz acquired the 71's free from the lien of the prior recorded chattel mortgage. There is no question but that Heintz was a "buyer" without knowledge of any claim of any lien, or other claim to the 71's. Clearly, Fincham was a merchant dealing in the selling of construction merchandise and equipment of a kind similar to the 71's. It matters little whether the 71's were actually sold from Fincham's lot or from Winslow's adjoining lot. The important fact is that Heintz purchased the tractors from Fincham, without notice, and in the ordinary course of business.

Ingersoll concedes that Heintz enjoys this privilege as to the cash paid Fincham and as to the trade-in on the 65's. It contends, however, that Heintz cannot be protected by the shield of the statute in connection with that part of the purchase price which represented the cancellation by Heintz of the $14,459.-68 Fincham debt. On this point, Ingersoll cites CRS 1963 155–1–201(9), which states in material part:

" 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale *but does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt.*" (Emphasis supplied.)

As to the cancelled debt, Ingersoll asserts that its mortgage on the 71's is prior in time and superior in right to that of Heintz. At issue is whether Heintz, which qualifies as a buyer in the ordinary course of business, as to the sale, should be permitted to maintain that status as to the entire transaction, even though part of the purchase price consisted of the satisfaction of a pre-existing debt. Heintz argues that the

2. Colorado Revised Statutes.

word "buyer", as used in the applicable section of the Code, is transactional and that the sale should be considered as a whole and "not fractionalized" into qualifying and non-qualifying parts.

Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966), is not in point. No direct authority has been cited. In *Jorgensen,* the *entire purchase price was paid* by cancellation of a pre-existing debt. The decision is sound, but is here of no assistance. Ingersoll's cases of General Credit Corp. v. Bill Olsen's Motor, Inc., 147 Colo. 227, 363 P.2d 489 (1961) and M. B. Thomas Auto Sales, Inc. v. Pickle, 305 P.2d 550 (Okla. 1956), are grounded on common law estoppel and do not touch on the construction of a statute which substantially modifies the common law. Comment to UCC 2–403. 1 ULA 306 (Master ed. 1968). The cases cited by Heintz are no more in point than those cited by Ingersoll.

It is urged that the Court should follow the authorities which interpret "buyer in the ordinary course of business" as that language is taken from Section 1 of the Uniform Trust Receipts Act (UTRA). The official comment to CRS 1963 155–1–201(9) clearly indicates that the drafters of UCC took that phrase from the indicated section of the UTRA. The comment states:

"9. 'Buyer in the ordinary course of business.' From Section 1, Uniform Trust Receipts Act. The definition has been expanded to make clear the type of person protected."

At the time of the adoption of the Code in Colorado, as well as in Oregon, the phrase as used in UTRA, had been interpreted in at least two cases, Colonial Finance Co. v. DeBenigno, 125 Conn. 626, 7 Atl.2d 841 (1939) and Commercial Discount Co. v. Mehne, 42 Cal.App. 2d 220, 108 P.2d 735 (1940). It seems reasonable to assume that the legislative bodies of each of the adopting states had these interpretations of the phrase in UTRA in mind at the time of the enact-

ment of the UCC. In *DeBenigno,* an automobile dealer purchased from a distributor a vehicle for $1,112.33, of which $182.36 was paid in cash, the balance of the purchase price being a credit then standing on the books. The Court there held that the satisfaction of the indebtedness constitutes a present value and was, therefore, new value within the terms of the Act and that the dealer was a "buyer" in the ordinary course of business as to the full extent of the transaction. *Commercial Discount Co.* approved *DeBenigno.* The selection and enactment of a statute which has been judicially construed, is an adoption of that construction, unless a contrary intent clearly appears. Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L. Ed. 1787 (1948). The same rule is applicable to the adoption of the wording of a statute of another state. Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); National Surety Corp. v. Smith, 168 Or. 265, 324, 114 P.2d 118, 123 P.2d 203, 204 (1942). While the definition of the phrase was expanded by comment nine to Section 1–201, UCC, to make clear the type of persons protected, we must keep in mind that the UCC was not compiled until June 1, 1962, while the UTRA was published in 1933. Both Acts, of course, were compiled by the same group. Although the official comment in the UCC clearly indicates that the language "buyer in the ordinary course of business" was taken from Section 1 of the UTRA, there is nothing in the comment, nor in the definition of the phrase in the UCC, which would indicate a disagreement with the authorities construing the phrase under the UTRA. The UTRA was officially published as part of the Uniform Laws Annotated in 1959. Volume 9C cites the *DeBenigno* and *Commercial Discount* cases above mentioned. The publication of the UCC was not made until 1962.[3] Obviously, the compilers of the UCC were familiar with the cited decisions interpreting the phrase under the UTRA. I conclude that the

---

3. Edward Thompson Company.

decisions in *DeBenigno* and *Commercial Discount* are sound and should be followed on the facts of this case.

Be that as it may, Heintz's contention must be upheld on still another ground. CRS 1963 155–1–201(9) is of primary significance when construed in the light of CRS 1963 155–2–403, the Code's "Entrusting" section. The Comment[4] to that section makes it perfectly clear that the compilers wanted to "state a unified and simplified policy on good faith purchase of goods", and as to "buyers in the ordinary course of business", to create *a single principle* protecting persons who buy in ordinary course out of inventory." (Emphasis supplied.) It would be completely inconsistent with the announced policy to penalize a purchaser who qualified as a "buyer in the ordinary course of business", by "fractionalizing" the entire transaction and making the sale part good and part bad. The argument that under such a construction there would be nothing to prevent an unsecured creditor from paying $1,000.00 in cash and cancelling a $63,000.00 debt—thus affecting the very preference which the last line of CRS 1963 155–1–201(9) was designed to prohibit—is not sound. In such case, the *bona fides* of the transaction would be openly in question and it could well be argued that the cash element of the transaction was a strawman entirely incidental to the essence of the transaction and would be a "transfer * * * in total or partial satisfaction of the money debt." Certainly, the buyer in that case would not qualify as a "buyer in the ordinary course of business" for any part of the sale. Conceding that Fincham was in difficult financial straits at the

time of the transaction, nevertheless, there is no evidence and no contention that Heintz was aware of this fact, nor that this was anything but a transaction in the normal course of business. Heintz's good faith is not in question. I find on the facts and on the law that Heintz was a buyer in the ordinary course of business as to the entire purchase price paid for the 71's.

In view of this finding, I need not consider Heintz's alternative contention that if it is not recognized as a buyer in the ordinary course of business as to the entire purchase price paid for the 71's, that there was a failure of consideration and that on that basis, it is entitled to a return of the 65's. I might say that the contention is judicially attractive and that I would make such a finding if I had reached that particular issue.

## THE 65'S INGERSOLL-RAND v. GECC

Here, as on the previous issue, I must first determine the law which governs the transaction.

Consistent with its position throughout the litigation, GECC insists that the rights of the parties must be determined in accordance with Oregon law. The statutory law of that state, in my belief, destroys this contention. ORS 79.-1020(1), in material part, provides as follows:

"Except as otherwise provided in ORS 79.1030 on multiple state transactions and in ORS 79.1040 on excluded transactions, ORS 79.1010 to 79.-5070 apply so far as concerns any personal property and fixtures within the jurisdiction of this state: * * *".

---

4. "3. The definition of 'buyer in ordinary course of business' (section 1–201) is effective here and preserves the essence of the healthy limitations engrafted by the case-law on the older statutes. The older loose concept of good faith and wide definition of value combined to create apparent good faith purchasers in many situations in which the result outraged common sense; the court's solution was to protect the original title especially by use of 'cash sale' or of over-technical construction of the enabling clauses of the statutes. *But such rulings then turned into limitations on the proper protection of buyers in the ordinary market.* Section 1–201(9) cuts down the category of buyer in ordinary course in such fashion as to take care of the results of the cases, but with no price either in confusion or in injustice to proper dealings in the normal market." (Emphasis supplied.)

ORS 79.1030, one of the exceptions, provides in part:

"(2) If the chief place of business of a debtor is in this state, ORS 79.-1010 to 79.5070 govern the validity and perfection of a security interest and the possibility and effect of proper filing with regard to general intangibles or with regard to goods of a type which are normally used in more than one jurisdiction (such as automotive equipment, rolling stock, airplanes, road building equipment, commercial harvesting equipment, construction machinery and the like) if such goods are classified as equipment or classified as inventory by reason of their being leased by the debtor to others. *Otherwise, the law (including the conflict of laws rules) of the jurisdiction where such chief place of business is located shall govern."* (Emphasis supplied.)

▮ Inasmuch as the 65's are large earth moving trucks, there is no question but they belong in either the classification of "road building equipment", "construction machinery", or "automotive equipment", or all. It is conceded that Fincham, the debtor, has his chief place of business in Colorado. Consequently, the law of that state must govern. ORS 79.1030 refers to the entire body of Colorado law, statutory and decisional, including that state's law on conflicts. CRS 1963 155–9–102(1) and CRS 1963 155–9–103(2).

Ingersoll makes two contentions that its rights are prior in time and superior in right to those of GECC. First, that Fincham's sale of the 71's in breach of the terms of the Ingersoll chattel mortgage, destroyed Fincham's title to that property and, consequently, lost all right to the proceeds of the sale of the collateral, composed of the 65's. Furthermore, inasmuch as Fincham had no right to the 65's at the time GECC made its partial release in substitution of equipment agreement of March 13, 1967, GECC could not take a valid security interest in that property. Second, that even if Fincham did have an interest on which GECC's security interest could attach, Ingersoll enjoys priority to that interest by virtue of an after-acquired property clause in its May, 1966, chattel mortgage.

▮▮ (1) Under the UCC, the security interest attaches when there is an agreement that it attaches, value is given, and the debtor acquires rights in the collateral. CRS 1963 155–9–204(1). Ingersoll argues that GECC could not acquire title in the collateral for the reason that Ingersoll had absolute legal title to the 71's when Fincham breached the terms of the chattel mortgage and sold property. It is further argued that in losing all rights to the 71's, that Fincham lost all rights to the proceeds of the sale of the collateral, the 65's. Rosenthal v. Whitehead, 159 Colo. 565, 413 P.2d 909, 912 (1966), supports the view that legal title passed to Ingersoll on the breach of the mortgage, but it does not support the argument that the mortgagor retained no interest in the property. At least, he had the right of redemption and of possession as against all but Ingersoll. Moreover, *Rosenthal* does not touch on the issue of the rights of the parties to proceeds of the 65's. Certainly, Fincham's breach of the mortgage on the 71's conferred no specific right in Ingersoll to the 65's, nor to the proceeds of their sale. We must keep in mind that GECC qualified as a *bona fide* purchaser without notice of other claims, unless it can be said that it had constructive notice of the after-acquired property clause in the Ingersoll mortgage and consequently had constructive notice that such clause created a security interest or lien in the 65's.

▮ (2) Ingersoll's second argument on its rights to the proceeds of the sale of the 65's is based on the after-acquired property clause contained in its pre-code chattel mortgage on the 71's. GECC relies on the security interest in the 65's which was taken and perfected under the Colorado UCC and the Oregon UCC. The question presented is the time, if at all, when Ingersoll, under its pre-code chattel mortgage, acquired a

perfected security interest in the 65's *after* the effective date of the code. GECC earnestly contends that Ingersoll never acquired a perfected security interest, because at no time did it make a filing under the Colorado UCC. Ingersoll claims that no filing was necessary because it had already perfected its chattel mortgage by recording, prior to the effective date of the code and that its security interest was thus perfected in the 65's as soon as they were acquired by Fincham. Under the code, a person holding the security interest, which includes a clause adding after-acquired property as collateral, takes a security interest in the after-acquired property upon its acquisition by the debtor. CRS 1963 155–9–204. The security interest is perfected at the time the secured party files on the original agreement. CRS 1963 155–9–303. Inasmuch as Ingersoll did not follow the provisions of the code by filing under it, it cannot claim under those provisions.

Pre-code Colorado law, CRS 1963 21–1–2(1), (a) provided:

"Property subject to mortgage.— (1) (a). A chattel mortgage may be given upon personal property of any kind or character, including, but not by way of limitation, the following:

\*　\*　\*　\*　\*　\*

(f) After-acquired property, property not in existence or property to which title was not in mortgagor at the time of the execution and delivery of the mortgage. *Such mortgage shall attach to the interest of the mortgagor upon the property coming into being or when title thereto is acquired by the mortgagor."* (Emphasis supplied.)

■ Colorado cases such as First Nat'l. Bank of Montrose v. Felter, 65 Colo. 370, 176 P. 496 (1918) and J. I. Case Threshing Machine Co. v. Glass & Bryant Mercantile Co., 74 Colo. 535, 223 P. 35 (1924) holding that an after-acquired clause in a chattel mortgage is not effective unless the mortgagee has first taken possession of the property were decided prior to the enactment of CRS 1963 21–1–2(1) (a) and are of no particular significance. Pre-code Oregon law recognized the same rule. Eberly v. Dudley, 314 F.2d 8 (9th Cir. 1962). There can be no question but that the Colorado statute completely destroyed the rule stated in the above Colorado cases. Under the statute, the after-acquired clause becomes effective, as to the interest of the mortgagor, upon the property coming into being or when title thereto is acquired by the mortgagor. Similar statutes in other Courts have been so construed. Stockyards Loan Co. v. Nichols, 243 F. 511 (8th Cir. 1917); Mason v. Citizens Nat'l Trust & Savings Bank of Los Angeles, 71 F.2d 246 (9th Cir. 1934); 37 Univ. of Colorado Law Review 11, 18–19 (1964). It seems clear that if pre-code Colorado law is applied, Ingersoll would take a security interest in the 65's at the time of Fincham's acquisition and that such interest would be valid as against GECC.

Of great significance, in arriving at a proper conclusion, is the saving clause of the Colorado UCC. 155–10–101(2), which provides:

"(2) Transactions validly entered into prior to the effective date of this chapter and the rights, duties, and interests flowing from them remain valid thereafter and may be terminated, completed, consummated, or enforced as required or permitted by any statute or other law amended or repealed by the enactment of this chapter as though such repeal or amendment had not occurred."

GECC argues that Ingersoll's interest in the 65's, if any, by virtue of Fincham's acquisition, is a new transaction which requires application of the Code and thus a Code filing. Although Rosenberg v. Rudnick, 262 F.Supp. 635 (D.Mass. 1967) and In re Portland Newspaper Publishing Co., 271 F.Supp. 395 (D.Or. 1967) each involved an issue on whether there was a "new transaction" when an after-acquired property interest attached to subsequently acquired chattels, those cases are clearly distinguishable. In each, a trustee in bankruptcy contended

that the after-acquired inventory clauses in the security agreements amounted to preferences which were voidable under § 60 of the Bankruptcy Act, 11 U.S.C. § 96, for the reason that the debtor had acquired portions of its inventory within the four months immediately preceding bankruptcy. The decision in each case turned on the peculiar provisions of the Bankruptcy Act. Here, we are concerned with state law, rather than federal. Justice Ford, in *Rosenberg*, specifically mentioned the perfection "of the lien" need not be under state law and that the only perfection required is that necessary to meet the test of § 60(a)(2) of the Bankruptcy Act.

The exhaustive research of counsel for the respective parties, and of the Court, has uncovered only one case in point. Charles S. Martin Distributing Co., Inc. v. First State Bank of Blakely, 114 Ga. App. 693, 152 S.E.2d 599 (1966). There, the bank properly recorded a bill of sale as security for a debt on a furniture store's inventory, with clauses in the bill covering future advances and future acquisitions or substitution of additional inventory. The bill of sale was properly executed and recorded prior to Georgia's adoption of the UCC. Subsequent to the effective date of the Code, the debtor company granted security interest to two other parties. The bank did not refile under the UCC. The debtor became insolvent and the existing inventory, none of which was in existence at the time the bank took its security interest, was sold. In determining the interest of the respective parties, the Georgia Court noted the provisions of the transitional provision of the UCC.[5] It is clear that the Court considered the bank's claim under the after-acquired inventory clause as merely an enforcement of its pre-code security interest and that no refiling by the bank after the effec-

tive date of the Code was necessary in order to protect the bank as to subsequent security interest acquired and filed under the Code. I agree with the Georgia Court that the purpose of requiring a refiling under the Code is to provide notice and that the previous filing was "notice to all of the world of the bank's claim of a security interest in after-acquired inventory." Moreover, I agree with the Georgia Court that the pre-code filing should make that instrument superior to instruments subsequently filed, even though filed under the Code. Here, as in *Martin*, the requirement of notice was completely served by the pre-code recording of the Ingersoll chattel mortgage in Adams County, Colorado. Of interest is the fact that this is the same county where GECC later filed its release and substitution of security agreement on the 65's. The fact that the 65's were in Oregon at the time they were acquired by Fincham is of no particular significance.

GECC knew that Fincham was a resident and operated his principal business in the state of Colorado. Obviously, it knew that the UCC controlled in Colorado and likewise in the state of Oregon. It is presumed that it knew of the saving clause in the Colorado code which continued validity in the pre-code chattel mortgage. It filed its own security agreement pursuant to the UCC in Colorado and the UCC in Oregon. Under these circumstances, I hold that GECC had constructive notice of the Ingersoll chattel mortgage and its after-acquired property provisions. The UCC had been in effect in Oregon long prior to the execution and delivery of Ingersoll's pre-code chattel mortgage.

In arriving at a proper conclusion, I cannot overlook the declared purpose of UCC § 1–102.[6] Without question the

---

5. Identical to C.R.S.1963 155–10–101(2).

6. "§ 1–102. *Purposes; Rules of Construction; Variation by Agreement.*
   (1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this Act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

code was designed to bring the body of commercial law into the contemporary world of business. In re United Thrift Stores, Inc., 363 F.2d 11 (3d Cir. 1966). Its principal purpose was to meet the contemporary needs of a fast moving commercial society. Arcuri v. Weiss, 198 Pa.Super. 506, 608, 184 A.2d 24 (1962).

ORS 79.1030(2) makes it clear that the law of the jurisdiction where the chief place of business of the debtor is located shall govern the validity and perfection of security interest.

Returning for the moment to the Heintz claims: Heintz did not have actual knowledge of the claims of Ingersoll until after it had traded the 65's to Fincham and until after the 65's had moved out of Fincham's possession. As previously stated, Heintz was a buyer in the ordinary course of business and had no notice of third party claims until after the 65's had been shipped pursuant to Fincham's directions.

The foregoing shall serve as my findings and conclusions.

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions."
ORS 71.1020(1) (2).